DONALD G. GRISWOLD AND LILLIAN S. GRISWOLD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CLA-VAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 74135, 74136. Filed December 31, 1962.

*John E. Scheifly, Esq.*, and *Irving M. Grant, Esq.*, for the petitioners.

*Karl M. Samuelian, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| | Year [1] | Deficiency |
|---|---|---|
| Donald G. and Lillian S. Griswold, Docket No. 74135 { | 1952 | $112,141.78 |
| | 1953 | [2] 1,013.50 |
| Cla-Val Co., Docket No. 74136 { | [3] 1953 | 11,374.99 |
| | [3] 1954 | 7,770.96 |
| | 1955 | 7,116.94 |
| | 1956 | 23,027.71 |
| | 1957 | 2,035.20 |

[1] Individual petitioners—calendar years; corporate petitioner—fiscal years ended March 31 of the indicated years.

[2] At the trial respondent amended his answer to increase the Griswolds' 1953 deficiency to $24,459.46.

[3] Income and excess profits taxes.

Many of the issues raised in the pleadings, including all those relating to the corporate petitioner's taxable years 1956 and 1957, have been resolved by stipulation. The excess profits tax issue relating to the corporate petitioner's taxable year 1954 has not been pursued either at trial or on brief and we assume it has been abandoned. The issues remaining to be decided all relate to the deductibility as charitable contributions of donations to the Sherry Griswold Foundation. These issues are:

(1) Was the Sherry Griswold Foundation organized and, for the years 1952 through 1955, operated exclusively for the exempt purposes specified in sections 23(o)(2) and 23 (q)(2) of the 1939 Code and section 170(c)(2)(B) of the 1954 Code;

(2) If the first issue is answered in the affirmative, then are contributions to the Sherry Griswold Foundation nevertheless not deductible because the Foundation engaged in prohibited transactions with the purpose of diverting its corpus or income from its exempt purposes and the prohibited transactions involved a substantial part of the Foundation's corpus or income;

(3) If the first issue is answered in the negative, then are contributions to the Sherry Griswold Foundation nevertheless deductible because made for the use of organizations organized and operated exclusively for the exempt purposes specified in the Code sections referred to above; and

(4) If the contributions are deductible, then is the contribution made by Cla-Val Co. in its 1955 taxable year deductible in that year?

### FINDINGS OF FACT.

The facts stipulated to by the parties are incorporated herein by reference and hereby found as stipulated.

Petitioners Donald G. Griswold (hereinafter sometimes referred to as Griswold) and Lillian S. Griswold (hereinafter sometimes referred to as Lillian), husband and wife, reside at 2231 Pacific Drive, Corona del Mar, Calif. Their Federal income tax returns for the years 1952 and 1953 were filed with the district director of internal revenue at Los Angeles, Calif.

Petitioner Cla-Val Co. (hereinafter sometimes referred to as Cla-Val) is a California corporation organized December 8, 1947, with its principal office at 17th and Placentia, Newport Beach, Calif. It reports its income on an accrual basis and upon a fiscal year ending March 31 for Federal income tax purposes. Cla-Val's Federal income tax returns for the taxable years 1953 through 1955 were filed with the district director of internal revenue at Los Angeles, Calif. At all times here pertinent Griswold was Cla-Val's president and sole stockholder.

For some time prior to March 31, 1952, Griswold was the owner of Cla-Val Co. (hereinafter sometimes referred to as Company), a sole proprietorship, which operated a foundry and manufactured and sold hydraulic valves. On April 1, 1952, Griswold transferred Company's hydraulic valve business assets, subject to liabilities, to Cla-Val in exchange for 1,000 shares of Cla-Val's no-par common stock. On April 1, 1952, Griswold transferred Company's land and buildings to Corelco, Inc. (hereinafter sometimes referred to as Corelco), a California corporation. At all times here pertinent Griswold was the sole stockholder of Corelco. Thereafter Griswold transferred Company's foundry business to Soundcast Co. (hereinafter sometimes referred to as Soundcast), a California corporation. At all times here pertinent Griswold was the sole stockholder of Soundcast.

On or about December 30, 1952, Griswold and Lillian executed an instrument creating the Sherry Griswold Foundation (hereinafter sometimes referred to as Foundation), named after their son who was killed in action during World War II. At all times here pertinent Griswold and Lillian have been the sole trustees of Foundation. Foundation filed with the district director of internal revenue at Los Angeles, Calif., fiduciary income tax returns each April during 1954 through 1956 for the immediately preceding calendar year, except that the return for 1952 was filed April 30, 1954.

Pertinent provisions of the trust instrument creating the Sherry Griswold Foundation are as follows:

DECLARATION OF TRUST, Made this 30th day of December, 1952, by DONALD G. GRISWOLD and LILLIAN S. GRISWOLD, * * *

WITNESSETH:

1. Certain facts and certain circumstances and/or events which occurred or exist are now recited as a part hereof, along with certain of the denominations which will be hereinafter used, all as follows; to wit:

(a) the initial Trustees of this Trust are DONALD G. GRISWOLD and LILLIAN S. GRISWOLD. * * *

\* \* \* \* \* \* \*

The singular term "Original Trustee" as used herein shall designate the individuals who may from time to time be acting as Trustees hereunder.

\* \* \* \* \* \* \*

(g) The Trust created by this instrument shall be known as the "SHERRY GRISWOLD FOUNDATION," in memory of the deceased son of DONALD G. GRISWOLD and LILLIAN S. GRISWOLD.

2. The present Original Trustee declares that it holds title to the Trust Estate as Trustee for the charitable uses and purposes and upon the terms and conditions set forth herein. The Successor Trustee, and any person becoming one of those comprising the Original Trustee, by accepting the office of Trustee upon the contingency provided herein, shall adopt the Declaration of Trust in this paragraph contained.

\* \* \* \* \* \* \*

5. The Trust created by this instrument and all transfers, gifts, conveyances, and assignments thereto shall be irrevocable. All instruments whereby property, rights, or privileges are transferred, given, conveyed, or assigned to the Trustee, wherein the fiduciary character of the transferee is revealed, shall state that the said transfer is absolute and irrevocable. Every instrument of receipt executed by the Trustee wherein it acknowledges that it holds property, rights, or privileges transferred to it as a part of the Trust Estate, shall state that the transfer in trust evidenced by the said instrument of receipt is absolute and irrevocable.

\* \* \* \* \* \* \*

7. Upon termination of this Trust, whether by virtue of the exercise of the power to terminate described above, or by force of law, or by judicial decree, or for any cause or reason whatsoever, all legal and equitable right and title to the Trust Estate at the time of such termination shall vest in The First Church of Christ, Scientist, at Boston, Massachusetts. If the gift over to said organization shall fail for any reason, then all right, title, and interest in and to the Trust Estate shall be distributed to recognized and established Christian Science Branch Churches in a manner and in proportions to be decided upon by five (5) registered Christian Science Practitioners who are to be appointed by the Successor Trustee. If the two above gifts over shall fail for any reason, then all right, title, and interest in and to the Trust Estate shall vest in the United States of America, in fee simple absolute. It is the intention of the Trustors, acting for themselves and for their heirs, executors, administrators, and assigns, to transfer and relinquish all beneficial interest in the Trust Estate, and they desire that any court construing this instrument, whether in exercise of its *cy pres* power, or otherwise, give effect to the said intention.

8. The Trustee is expressly authorized to hold and retain any securities, properties, or investments received by it by transfer from the Trustors as long as in its absolute and uncontrolled discretion it elects to do so, and neither Section 2261 of the Civil Code of California, nor any other statutory provision, shall constitute a limitation upon the exercise by the Trustee of its discretion in continuing to hold securities, properties, or investments received hereunder. The Trustee shall have all such powers and is authorized to do all such acts, take all such proceedings, and exercise all such rights and privileges in the management of the Trust Estate as if the absolute owner thereof, * * * provided that in investing, re-investing, purchasing, acquiring, exchanging, selling, and managing property for the benefit of this Trust the Trustee shall exercise the judgement

and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. * * *

9. It is the intention of the Trustors that this Trust qualify as a charitable trust under the laws of the State of California, and that the Trust and persons contributing property thereto, be entitled to all of the exemptions, deductions, credits, and other benefits accorded to charitable organizations and persons making contributions to such organizations, by the Internal Revenue Code of the United States, by judicial decisions interpreting the Internal Revenue Code, and by the administrative regulations of the Treasury Department of the United States, both now existing and subsequently adopted. In furtherance of the intention described in this paragraph, the Trustee is expressly empowered to make such amendments to this instrument as are necessary to permit the Trust and the Trustors to qualify for the status, exemptions, deductions, credits, and other benefits described above. The said power of amendment may not be construed to authorize any amendment whereby any part of the assets or income of the Trust may be diverted from the charitable and public purposes set forth herein.

    *        *        *        *        *        *        *

12. This Trust has been created solely to further and encourage, by means of financial aid and contributions from this Trust, such religious, charitable, scientific, literary, and/or educational purposes as the Original Trustee shall select and designate. To effect said purpose, the original Trustee shall have the power to:

(a) Accumulate and/or re-invest part or all of the income of the Trust for such periods and in such amounts as it shall deem necessary in order to best accomplish the purposes of this Trust;

(b) Select from time to time one or more religious, charitable, scientific, literary, and/or educational society, institution, association, and/or corporation, public or private, as shall be deemed worthy of financial assistance;

(c) Pay to the society, institution, association, and/or corporation selected under the provisions of subparagraph (b) above such sums, at such time or times, and in such manner and with such limitations, as the Original Trustee shall deem proper, beneficial, and expedient. Such payments may be made from current income, accumulated income, or from principal, all within the sole discretion of the Original Trustee.

    *        *        *        *        *        *        *

15. No person dealing with the Trustee shall be under any obligation to inquire into the propriety or legality of any transaction with the Trustee or to see to the application of moneys paid to the Trustee pursuant to such transaction.

Neither Griswold nor Lillian had experience as creator or trustee of a foundation prior to the establishment of Foundation. Griswold told his idea of establishing Foundation to two attorneys, who worked out the details.

Simultaneously with the execution of the trust instrument Griswold and Lillian transferred to Foundation, without consideration, $15,000 cash and land and a building thereon which then had a fair market value of $25,000 and were free of liens and encumbrances. On Decem-

ber 23, 1953, Griswold and Lillian transferred to Foundation, without consideration, $30,000 cash.

Cla-Val transferred to Foundation, without consideration, cash in the amounts and on the dates set forth below for the fiscal years indicated, pursuant to resolutions passed by its board of directors:

| Date of resolution | Date of payment | For fiscal year ended | Amount |
|---|---|---|---|
| Mar. 30, 1953 | June 2, 1953 | Mar. 31, 1953 | $15,000 |
| Mar. 24, 1955 | May 26, 1955 | Mar. 31, 1955 | 10,000 |

Cla-Val accrued these amounts for the fiscal years indicated and elected, in accordance with the procedures set forth in the applicable provisions of the Internal Revenue Code and regulations, to claim deductions for these amounts in the years for which they were accrued, in lieu of the years in which they were paid.

On May 5, 1954, Cla-Val transferred to Foundation, without consideration, an additional $9,500 cash pursuant to a resolution passed by Cla-Val's board of directors. This amount was claimed as a charitable contribution deduction by Cla-Val on its return for the fiscal year ended March 31, 1954. No written declaration that the resolution authorizing the $9,500 contribution was adopted by the board of directors during the taxable year was attached to Cla-Val's return for the fiscal year ended March 31, 1954, nor was a copy of the resolution attached to the return.

During the years 1953 through 1957, Foundation made donations in the following amounts to the following organizations:

*1953*

| | | |
|---|---|---|
| First Church of Christ, Scientist, Alhambra | $5,000 | |
| Goodwill Industries | 500 | |
| | | $5,500 |

*1954*

| | |
|---|---|
| John Brown Schools Foundation of California | 100 |

*1955*

| | | |
|---|---|---|
| First Church of Christ, Scientist, Alhambra | 3,000 | |
| First Church of Christ, Scientist, Arcadia | 150 | |
| First Church of Christ, Scientist, Newport Beach | 1,200 | |
| | | 4,350 |

*1956*

| | | |
|---|---|---|
| First Church of Christ, Scientist, Arcadia | 500 | |
| First Church of Christ, Scientist, Newport Beach | 510 | |
| Christian Science Society, Costa Mesa | 1,000 | |
| Foundation for Economic Education | 200 | |
| Principia Mothers | 300 | |
| | | 2,510 |

*1957*

| | |
|---|---|
| First Church of Christ, Scientist, Newport Beach_____ | $1,200 |
| Christian Science Society, Costa Mesa_____ | 2,000 |
| First Church of Christ, Scientist, Monterey Park_____ | 500 |
| Christian Science Monitor_____ | 100 |
| Goodwill Industries_____ | 500 |
| American Principles, Inc._____ | 1,000 |
| Griffith Park Maternity Home_____ | 1,000 |
| | $6,300 |

Foundation also made the following loans to Christian Science churches and societies, the proceeds of which loans were used to provide and maintain church reading rooms:

| Date of loan | Borrower | Amount | Interest | Unpaid balance Dec. 31, 1959 |
|---|---|---|---|---|
| Jan. 18, 1954__ | First Church of Christ, Scientist, Arcadia_____ | $3,000 | None_____ | 0 |
| Aug. 31, 1955_ | First Church of Christ, Scientist, Alhambra___ _____ | 5,000 | 4 percent_ | $725.22 |
| June 27, 1956_ | First Church of Christ, Scientist, Monterey Park___ | 3,000 | None_____ | 900.00 |

The recipients of these donations and loans were all qualified recipients of charitable contributions under sections 23 (o) and (q) and 170(c) of the Internal Revenue Codes of 1939 and 1954, respectively.

As trustee of Foundation, Griswold considered that his authority under paragraph 12 of the trust instrument to render financial aid was not restricted to rendering financial aid to charitable organizations but was broad enough to include the rendering of financial aid to students through non-interest-bearing loans.

On April 5, 1954, and November 5, 1954, Foundation loaned to Helen Smith (hereinafter sometimes referred to as Helen) a total of $1,000 without interest. Helen is not related[1] to Griswold or Lillian. Helen's brother was a Sunday-school pupil of Griswold, and her parents were acquainted with Griswold and Lillian and attended another branch of the same church. The loan was made in order to enable Helen to attend business school and was repaid in installments as follows: December 11, 1956—$200; August 13, 1957—$300; April 30, 1958—$500.

This loan was treated by Foundation as a "student aid loan." No other student loans were made by Foundation during the years 1952 through 1956.

During the years 1952 through 1956, Foundation leased portions of the building contributed to it by Griswold and Lillian and received rents from the tenants, none of whom were related[2] to Griswold or Lillian.

During the years 1952 through 1956, Foundation made the following loans, and no others, in addition to those described above:

---

[1] The stipulations from which these findings are derived do not indicate what is meant by "related."

[2] See footnote 1, *supra*.

| Borrower | Date of loan | Amount | Interest rate, percent | Date due | Date repaid | Property pledged |
|---|---|---|---|---|---|---|
| S. A. and R. M. Griswold | Mar. 11, 1953 | $9,000 | 6 | | Oct. 8, 1953 | First deed of trust, residential real property. |
| Do | May 6, 1953 | 4,000 | 6 | | July 24, 1953 | Do. |
| Soundcast | Sept. 25, 1953 | 15,000 | 6 | Dec. 24, 1953 | Dec. 9, 1953 | None. |
| S. A. and R. M. Griswold | Feb. 26, 1954 / Mar. 22, 1954 | 7,000 | 6 | | June 2, 1954 | First deed of trust, residential real property. |
| Do | Apr. 8, 1954 / May 13, 1954 | 7,500 | 6 | | $4,000, June 2, 1954; $3,500, Aug. 27, 1954 | First deed of trust, residential real property. |
| Griswold | June 8, 1954 | 50,000 | 6 | Demand | Jan. 3, 1955 | None. |
| Georgia Riggs | June 11, 1954 | 1,500 | 6 | | June 23, 1955, May 25, 1956 | Do. |
| S. A. and R. M. Griswold | Feb. 20, 1955 | 10,000 | 6 | | July 26, 1955 | First deed of trust, residential real property. |
| F. W. Griswold | Mar. 28, 1955 | 25,000 | 6 | May 27, 1955 | Renewed | None. |
| Renewal | May 25, 1955 | 25,000 | 6 | Aug. 26, 1955 | Aug. 31, 1955 | Do. |
| Cla-Val | Aug. 17, 1955 | 60,000 | 6 | Demand | $45,000, Dec. 30, 1955; $15,000, Aug. 29, 1956. | None. |
| Do | Sept. 15, 1955 | 25,000 | 6 | do | Apr. 3, 1956 | Do. |
| Corelco | Sept. 15, 1955 | 2,300 | 6 | do | Dec. 6, 1955 | Do. |
| Cla-Val | Jan. 9, 1956 | 45,000 | 6 | Mar. 9, 1956 | Renewed | Do. |
| Renewal | Mar. 9, 1956 | 45,000 | 6 | June 8, 1956 | Aug. 29, 1956 | Do. |
| Myrtle S. Allen and Verle N. Fry, as trustees for Mary J. Anderson, Sallie N. Anderson, Martha L. Anderson, and Rodney R. Anderson (hereinafter sometimes referred to as "the Anderson trust"). | Apr. 5, 1956 | 23,000 | 6 | Demand | Nov. 6, 1957 | Second deed of trust, commercial real property. |

S. A. Griswold is Griswold's nephew. R. M. Griswold is S. A. Griswold's wife. At all times here pertinent, S. A. Griswold was engaged in the business of constructing buildings and of constructing and selling houses.

Each of the loans to S. A. Griswold was evidenced by a note bearing 6-percent interest and secured by a first deed of trust on residential real property. S. A. Griswold used the proceeds of these loans in the construction of houses upon the properties which secured each respective loan. Each loan was repaid out of the escrowed proceeds of the respective sale.

| Date of loan | Amount of loan | Sales price of property subject to lien |
|---|---|---|
| Mar. 11, 1953 | $9,000 | $16,525 |
| May 6, 1953 | 4,000 | 17,400 |
| Feb. 26, 1954, Mar. 22, 1954 | 7,000 | 22,800 |
| Apr. 8, 1954, May 13, 1954 | 7,500 | 22,000 |
| Feb. 20, 1955 | 10,000 | 17,800 |

F. W. Griswold is Griswold's brother.

Griswold and Lillian are not related [3] to Myrtle S. Allen, Verle N. Fry, Mary J. Anderson, Sallie N. Anderson, Martha L. Anderson, or Rodney R. Anderson.

Georgia Riggs is not related [4] to Griswold or Lillian. She worked occasionally for Foundation, for which work she was compensated. Georgia Riggs' husband was a builder. At the time of the loan to his wife, he had purchased a house for resale and they used the proceeds of the loan in altering and rebuilding that house. Griswold did not know whether Georgia Riggs could have borrowed the $1,500 from another source.

Foundation never solicited the public for loans nor did it ever advertise that it was lending money.

During the years 1953 through 1956, Griswold, Lillian, Cla–Val, Corelco, and Soundcast borrowed the following amounts from banks:

[3] See footnote 1, *supra.*
[4] See footnote 1, *supra.*

| Borrower | Lender | Date of loan | Amount of loan | Interest rate (percent) | Due date | Date of payment | Property pledged | Guaranteed by DGG and LSG[1] |
|---|---|---|---|---|---|---|---|---|
| Corelco | California Bank | Apr. 10, 1953 | $15,000 | 5 | July 9, 1953 | July 9, 1953 | None | Yes. |
| Soundcast | California Bank | Apr. 10, 1953 | 20,000 | 5 | July 9, 1953 | Renewed[2] | do | Yes. |
|  | Renewal | July 9, 1953 | 15,000 | 5 | Oct. 7, 1953 | Renewed | do | Yes. |
|  | Renewal[1] | Oct. 7, 1953 | 15,000 | 5 | Jan. 5, 1954 | Dec. 3, 1953 | do | No. |
| Cla-Val | Commerce Trust Co | Aug. 12, 1953 | 72,900 | 3¾ | Aug. 10, 1954 | Renewed[3] | Insurance policies |  |
| Griswold and Lillian | California Bank | Dec. 14, 1953 | 50,000 | 5 | Jan. 13, 1954 | Jan. 4, 1954 | None |  |
| Do | Valley National Bank | Mar. 11, 1954 | 30,000 | 4 | Apr. 9, 1954 | Apr. 2, 1954 | do |  |
| Do | Valley National Bank | Aug. 5, 1955 | 4,000 | 4 | Nov. 3, 1954 | Nov. 4, 1955 | do |  |
| Do | Valley National Bank | Sept. 13, 1955 | 75,000 | 4½ | Oct. 13, 1955 | Renewed | do |  |
|  | Renewal | Oct. 13, 1955 | 75,000 | 4½ | Nov. 14, 1955 | do | do |  |
| Do | Renewal[5] | Nov. 14, 1955 | 50,000 | 4½ | Feb. 24, 1956 | Renewed[4] | do |  |
|  | Renewal[5] | Feb. 24, 1956 | 50,000 | 4½ | May 24, 1956 | Renewed | do |  |
| Do | Renewal[1] | May 24, 1956 | 50,000 | 4½ | Aug. 22, 1956 | Aug. 22, 1956 | do | Yes. |
| Corelco | Valley National Bank | Sept. 17, 1955 | 25,000 | 4½ | Oct. 17, 1955 | Oct. 18, 1955 | do | Yes. |
|  | Mariners Bank | Oct. 4, 1955 | 23,000 | 5 | Jan. 2, 1956 | Renewed | do | Yes. |
|  | Mariners Bank | Jan. 2, 1956 | 23,000 | 5 | Jan. 2, 1956 | do | do |  |
| Soundcast | Renewal | Apr. 1, 1956 | 23,000 | 5 | Demand or Apr. 1, 1956. | Aug. 14, 1956 | do | Yes. |
|  | Renewal | June 29, 1956 | 23,000 | 5 | Demand or June 30, 1956. | Aug. 14, 1956 | do | Yes. |
| Griswold and Lillian | Valley National Bank | Oct. 13, 1955 | 12,000 | 4½ | Jan. 11, 1956. | Feb. 17, 1956 | do | Yes. |
|  | Mariners Bank | Dec. 12, 1955 | 23,000 | 5 | Mar. 12, 1956. | Renewed | do | Yes. |
| Cla-Val | Renewal | Mar. 26, 1956 | 23,000 | 5 | June 10, 1956. | do | do | Yes. |
|  | Renewal | June 26, 1956 | 23,000 | 5 | Demand or Sept. 24, 1956. | Aug. 14, 1956 | do |  |
| Griswold and Lillian | Mariners Bank | Dec. 29, 1955 | 45,000 | 5 | Demand or Mar. 28, 1956. | Renewed | 1,000 shares of Corelco stock. |  |
|  | Renewal | Mar. 28, 1956 | 45,000 | 5 | Demand or June 26, 1956. | do | do |  |
|  | Renewal | July 13, 1956 | 45,000 | 5 | Demand or Oct. 11, 1956. | Aug. 2, 1956 | do |  |
| Corelco | Mariners Bank | Jan. 11, 1956 | 23,000 | 5 | Apr. 11, 1956. | Renewed | None | Yes. |
|  | Renewal | Apr. 11, 1956 | 23,000 | 5 | July 10, 1956. | do | do | Yes. |
|  | Renewal | July 13, 1956 | 23,000 | 5 | Demand or Oct. 11, 1956. | Aug. 24, 1956 | do | Yes. |

[1] Donald G. Griswold and Lillian S. Griswold.

[2] Part payment of $5,000 principal.

[3] On Aug. 12, 1953, Cla-Val owned and was the sole beneficiary of certain insurance policies on the life of Griswold, issued by Prudential Insurance Co. of America, among which were a policy in the face amount of $125,000, and another policy in the face amount of $75,000. On Aug. 12, 1953, Cla-Val borrowed $72,900 from Commerce Trust Co., Kansas City, Mo. The loan was evidenced by a note due July 12, 1954, bearing interest at 3¾ percent per annum, payable in advance and secured by assignments of the $125,000 policy and the $75,000 policy. From time to time thereafter, Cla-Val renewed the loan. Each renewed loan was likewise secured by assignments of the $125,000 and $75,000 policies.

[4] Part payment of $25,000 principal.

[5] First Western Bank, successor to Valley National Bank

When Griswold was indebted to a bank he considered himself obligated to give the bank financial statements. When he was not so indebted, he considered that he had no such obligation—it was the banks' "free choice" whether they wanted to loan him money. Griswold declined to give financial statements to banks because he did not wish his competitors or people who were interested in buying his business to have inside information on his financial status.

In connection with his $45,000 loan from the Mariner's Bank, secured by Corelco stock, Griswold gave his personal financial statement to a bank officer who was pledged to keep the information confidential. This was a small bank and its loaning limit without collateral was $25,000. The loan limit with collateral was $45,000.

At the time Company's assets were transferred to Cla-Val, Cla-Val assumed Griswold's $135,000 debt to the California Bank. In connection with this transaction, Griswold and Lillian, on April 8, 1952, executed a written guarantee of Cla-Val's then present and future obligations to the California Bank to a maximum of the principal sum of $250,000 at any one time. Also in connection with this transaction Corelco, on April 8, 1952, executed a written guarantee of Cla-Val's then present and future obligations to the California Bank to a maximum of the principal sum of $250,000 at any one time. On April 10, 1953, Griswold and Lillian executed a written guarantee of Corelco's and Soundcast's then present and future obligations to the California Bank to a maximum of the principal sum of $50,000 at any one time.

Cla-Val reported taxable income on its returns as follows:

Fiscal year ended:

| | |
|---|---|
| Mar. 31, 1953 | $899,698.97 |
| Mar. 31, 1954 | 330,542.25 |
| Mar. 31, 1955 | 477,982.07 |
| Mar. 31, 1956 | 274,915.04 |
| Mar. 31, 1957 | 616,883.29 |

Griswold's and Lillian's joint returns showed adjusted gross incomes of $242,867.60 for 1952 and $186,560.02 for 1953.

Corelco's and Soundcast's net worth on certain dates, as shown by their books and records, was:

| | Corelco | Soundcast |
|---|---|---|
| Aug. 31, 1953 | Not given | $48,511.64 |
| Sept. 30, 1953 | Not given | 53,146.03 |
| May 31, 1954 | 1 $113,862.39 | 99,950.64 |
| Aug. 31, 1955 | 1 132,025.77 | Not given |
| Sept. 30, 1955 | 1 133,943.12 | Not given |

1 Includes $975.34 of organization expense.

Griswold and Lillian claimed deductions for charitable contributions in the following amounts (exclusive of amounts transferred to Foundation) on their Federal income tax returns for the years 1951, 1952, and 1953:

| Year | Contributions |
|------|---------------|
| 1951 | $305 |
| 1952 | 1,280 |
| 1953 | 280 |

Cla-Val claimed deductions for charitable contributions in the following amounts (exclusive of amounts transferred to Foundation) on its Federal income tax returns for the years indicated:

| Year ended | Contributions |
|------------|---------------|
| Mar. 31, 1953 | $125 |
| Mar. 31, 1954 | 250 |
| Mar. 31, 1955 | 250 |
| Mar. 31, 1956 | None |
| Mar. 31, 1957 | 300 |

At the time of the trial Griswold and Lillian had been active in the Christian Science church for over 20 years and were both Sunday-school teachers. Griswold was then president and chairman of the board of directors of the First Church of Christ, Scientist, at Newport Beach, Calif. Griswold and Lillian have held different offices in their church.

The parties have stipulated that Foundation had cash in bank and net worth in the following amounts on the indicated dates:

| Date | Cash in bank | Net worth |
|------|--------------|-----------|
| Dec. 31, 1952 | $15,000.00 | $40,000.00 |
| Mar. 1, 1953 | 15,335.00 | 40,148.90 |
| May 1, 1953 | 6,605.00 | 40,232.80 |
| Sept. 1, 1953 | 16,958.81 | 50,214.41 |
| Dec. 31, 1953 | 56,197.51 | 80,080.75 |
| Feb. 1, 1954 | 53,371.31 | 80,161.50 |
| Mar. 1, 1954 | 49,936.31 | 80,133.45 |
| Apr. 1, 1954 | 46,501.31 | 80,105.40 |
| May 1, 1954 | 42,393.01 | 80,004.05 |
| June 1, 1954 | 48,208.01 | 89,726.00 |
| Dec. 31, 1954 | 32,081.81 | 110,348.39 |
| Feb. 1, 1955 | 82,017.78 | 160,320.34 |
| Mar. 1, 1955 | 72,082.78 | 160,292.29 |
| Aug. 1, 1955 | 67,632.27 | 168,626.53 |
| Sept. 1, 1955 | 27,647.27 | 168,548.48 |
| Dec. 31, 1955 | 48,331.85 | 118,509.92 |
| Feb. 1, 1956 | 3,956.85 | 118,541.87 |
| Dec. 31, 1956 | 89,655.95 | 140,868.66 |

The following schedule indicates Foundation's receipts and expenditures during the years 1952 through 1956:

*Schedule of receipts and expenditures, 1952–56*

| Receipts | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|
| *Contributions* | | | | | |
| Griswold & Lillian | $40,000 | $30,000.00 | $20,000.00 | 0 | $20,000.00 |
| Cla-Val Co | 0 | 15,000.00 | 9,500.00 | $10,000.00 | 0 |
| Total | 40,000 | 45,000.00 | 29,500.00 | 10,000.00 | 20,000.00 |
| *Income* | | | | | |
| Interest | 0 | 538.84 | 1,917.57 | 2,281.50 | 4,365.89 |
| Rental | 0 | 1,871.62 | 1,215.00 | 1,655.00 | 2,540.00 |
| Total | 0 | 2,410.46 | 3,132.57 | 3,936.50 | 6,905.89 |
| *Expenses and donations* | | | | | |
| Expenses: | | | | | |
| Depreciation | 0 | 1,116.76 | 1,116.66 | 1,116.66 | 1,116.66 |
| Other | 0 | 712.95 | 1,148.27 | 408.31 | 920.49 |
| Total | 0 | 1,829.71 | 2,264.93 | 1,524.97 | 2,037.15 |
| Donations | 0 | 5,500.00 | 100.00 | 4,350.00 | 2,510.00 |

Griswold read an article in a January 1955 magazine concerning William S. Lane (hereinafter sometimes referred to as Lane), a science and mathematics instructor in a small public high school in the State of Washington. The school had little funds but managed to equip its laboratories and to graduate outstanding students. Griswold made inquiries and, in March 1955, was sent information tending to substantiate the article's high praise of Lane's ability and devotion.

Before he left for Washington, D.C., in 1957 to discuss Foundation's tax status with respondent's representative, Griswold made contact with Lane and arranged to meet him after Griswold returned from this trip. During his visit with Lane, Griswold discussed the possibility of Lane operating a school for Foundation to accomplish the type of work he had been successful at in Washington—rehabilitation of young boys and finding training methods for them.

The first time Lane could leave his school, in the summer of 1957, he came to California to investigate the possibility of operating a school for Foundation. Lane prepared a report dated August 9, 1957, setting forth suggested educational programs for Foundation.

Griswold attempted to hire Lane to start a school for Foundation. However, Lane considered that he had an obligation to complete his work in Washington and estimated that he would not be available at least until the close of the next semester.

On April 2, 1956, Foundation filed a tax-exemption application with the district director of internal revenue at Los Angeles, Calif. Foundation's purpose was stated on this application to be: "To render financial aid and make contributions to selected religious, charitable, scientific, literary and/or educational organizations."

On June 24, 1957, respondent ruled that Foundation was not entitled to exemption from income tax. A protest was filed on or about September 2, 1957, and on November 19, 1957, respondent affirmed the ruling.

Respondent's June 24, 1957, ruling constituted the first written notice that respondent determined Foundation had engaged in prohibited transactions.

Foundation never engaged in or carried on propaganda of any sort. Foundation never attempted to influence legislation, never intervened in or participated in any political campaign, and never published or distributed any statements in connection with any political campaign.

Foundation was organized and operated exclusively for religious, charitable, scientific, literary, and/or educational purposes. No part of the net earnings of Foundation inured to the benefit of any private shareholder or individual.

No substantial part of Foundation's corpus or income was involved in loans made for the purpose of diverting its corpus or income from exempt purposes.

Cla-Val filed its Federal income tax return for its taxable year 1955 on June 14, 1955. It paid the tax there disclosed in equal installments on June 14, 1955, and September 15, 1955. The notice of deficiency to Cla-Val was mailed by respondent on April 23, 1958.

The charitable contribution deductions of Griswold and Lillian were "disallowed since the Foundation is not a qualified organization as defined by section 23(o)" of the 1939 Code. Cla-Val's deductions were disallowed "since the Foundation was not a qualified recipient within the purview of section 23(q) of the [1939 Code] and section 170 of the" 1954 Code.

OPINION.

*Issue 1.*

Section 23(o)(2) of the 1939 Code [5] and the relevant parts of section

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(o) CHARITABLE AND OTHER CONTRIBUTIONS.—In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States \* \* \*, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. For disallowance of certain charitable, etc., deductions otherwise allowable under this paragraph, see sections 3813 and 162(g)(2);

[Sec. 23(q)(2) authorized deductions for corporations in almost identical language.]

170 of the 1954 Code [6] authorized deductions for contributions to organizations which meet the requirements of those provisions.

Respondent contends that Foundation failed to meet the requirement of being organized and operated exclusively [7] for exempt purposes in that it was primarily a banking device for Griswold, his family, and his controlled corporations and that its principal purpose and activity was the business of making inadequately secured short-term business loans to Griswold, his family, and his controlled corporations out of funds that would otherwise have had to be paid to the Government as income taxes. Petitioners deny that Foundation had such a purpose. They maintain that Foundation's loans to petitioners and related persons were on terms no more favorable than those available to those persons from banks at that time; that the loans served the purpose of providing current income to Foundation to be used to further its exempt purposes; and that the income thus provided was so used.

We agree with petitioners.

Foundation's earned income for the years 1952 through 1955 (the years during which the contributions were made, deductibility of which is here at issue) amounted to $9,479.53. Depreciation on its rental property totaled $3,350.08 and other expenditures totaled $2,269.53. Its net earned income for this period equaled $3,859.92. During this time its gifts, all made to organizations concededly of the kind described in sections 23(o) and 23(q) of the 1939 Code and 170(c)(3) of the 1954 Code, totaled $9,950. In addition, Foundation

---

[6] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof \* \* \*;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).

\* \* \* \* \* \* \*

(d) DISALLOWANCE OF DEDUCTIONS IN CERTAIN CASES.—

(1) For disallowance of deductions in case of contributions or gifts to charitable organizations engaging in prohibited transactions, see section 503(e).

[Subsection (d)(1) was renumbered subsection (e)(1) by section 7(a)(2), Pub. L. 86–779.]

[7] "Exclusively," in this context, means that there is no nonexempt purpose that is "substantial in nature." *Better Business Bureau* v. *United States*, 326 U.S. 279, 283 (1945).

made loans totaling $10,000. Of this amount, $9,000 was lent to the same type of tax-exempt organization and $1,000 was lent to Helen Smith.

The loan to Helen aside, the Foundation's income was enhanced by the 6-percent interest it earned on its loans to petitioners and related persons; the Foundation's charitable expenditures for the years before us exceeded its income; and the Foundation also made loans during those years totaling an amount substantially greater than its net income. We conclude that Foundation was operated for tax-exempt purposes.

Respondent stresses the fact that Cla-Val's last loan from Foundation was overdue more than 2½ months. Petitioner replies that the loan was in fact repaid, with 6-percent interest for the entire time it was outstanding, and that it in no way disabled Foundation from making charitable contributions or loans. It also appears from the stipulated facts that a loan to Griswold from the Valley National Bank was overdue more than 5 weeks during this period and that that bank's successor, the First Western Bank, nevertheless subsequent twice renewed a separate unsecured Griswold loan for $50,000. We conclude that Griswold and his controlled corporations were regarded as being sufficiently good credit risks for banks to decline to penalize what would normally be a material delay in repayment. Under these circumstances we do not take the Cla-Val loan delinquency as an indication that Foundation was being operated for any nonexempt purpose substantial in nature.

Respondent maintains that Foundation's loan to Helen was not in furtherance of Foundation's charitable purposes. It was the first loan Foundation made to a student and no other such loan was made during the taxable years before the Court.

We note respondent concedes the loan was used to help Helen obtain a formal education and that the loan was repaid. Although we have doubts as to whether this loan was within the tax-exempt activities permitted Foundation, nevertheless we hold that petitioners have demonstrated that the granting of this loan did not constitute operation of Foundation [8] for a nonexempt purpose, substantial in nature,

---

[8] At the trial we reserved decision on respondent's objection to the introduction of evidence with regard to Foundation's relatively comprehensive student loan program. All of the loans under this program were made after Griswold was notified by the Internal Revenue Service that Foundation's exemption application was denied. In our deliberations we have given no weight to this evidence. The student loan program is consistent with a continuing intention of establishing an educational loan program but is equally consistent with a venture into a new field of charitable or educational activity in an effort to change a nonexempt organization into an exempt organization. This ambiguity causes the offered evidence to have no probative value with regard to Foundation's exempt status during the years for which the charitable contributions deductions here at issue were claimed. We therefore sustain respondent's objection to introduction of this evidence on the ground of relevance.

636

during the taxable years before us.[9]  Cf. *Better Business Bureau* v. *United States*, 326 U.S. 279 (1945) ; *Leon A. Beeghley Fund*, 35 T.C. 490 (1960), affd. 310 F. 2d 756 (C.A. 6, 1962) ; *Stevens Bros. Foundation, Inc.*, 39 T.C. 93 (1962).

During the years 1953 through 1956, Foundation made loans totaling $284,300 for clearly noncharitable purposes.  Of this amount, $197,300 was loaned to Griswold and his controlled corporations (Cla-Val, Corelco, and Soundcast), $37,500 to Griswold's nephew, $25,000 to Griswold's brother, $23,000 to the Anderson Trust, and $1,500 to Georgia Riggs.  Respondent maintains that these loans evidence a "primary purpose" in the operation of Foundation "of rendering financial aid to petitioner Griswold, members of his family, his corporations and private individuals."

Normally, any transaction is an aid to each of the parties involved, otherwise the parties would not have entered into the transaction. However, we do not consider that the loans to charities and Helen at zero and 4 percent may properly be considered together with the other loans, all at 6 percent and a number secured with substantial collateral. The latter loans would constitute "aid" for purposes of considering whether Foundation was operated for a nonexempt purpose substantial in nature if they were on terms better than could be obtained elsewhere or if the borrowers had difficulty in obtaining financing elsewhere.  See *Lesavoy Foundation*, 25 T.C. 924 (1956), reversed on another issue 238 F. 2d 589 (C.A. 3, 1956) ; *Stevens Bros. Foundation, Inc., supra.*

During the time Griswold and his corporations were borrowing $197,300 from Foundation, they borrowed $440,900 from banks.[10] Their taxable incomes and the net worths of the corporations were substantial in relation to the amounts borrowed from Foundation. Griswold and his controlled corporations do not appear to have been unable to borrow from banks during the years in question.   There is no evidence that bank loans were ever refused Griswold or his controlled corporations on account of their being bad credit risks. Cf. *Stevens Bros. Foundation, Inc., supra.*

Property was pledged on only one of the seven bank loans made to Griswold and Lillian and only one of the seven bank loans made to Griswold's controlled corporations during this period.  The remaining six bank loans to the corporations were supported by Griswold's and Lillian's guarantees.

[9] We do not view the "prohibited transactions" provisions of sec. 3813, I.R.C. 1939, and 503, I.R.C. 1954, discussed *infra* at Issue 2, as a limitation upon the activities which we may consider in determining whether Foundation operated for a nonexempt purpose substantial in nature.

[10] The record does not indicate whether any additional amounts had been borrowed by them from banks before 1953 and were outstanding for any part of the period before the Court.

We conclude petitioners have demonstrated that Griswold and his controlled corporations did not use Foundation as a source of funds not otherwise attainable.

Each loan by Foundation to Griswold's nephew was secured by a first deed of trust on real property subsequently sold for generally twice as much as the amount loaned and repaid out of the escrowed proceeds of the sale of that piece of property. We conclude that Griswold's nephew could have borrowed at least that amount from banks on the basis of the security granted by him to Foundation.

The loan by Foundation to the Anderson trust was secured by a second deed of trust on commercial property, part of which was rented by a bank. None of the trustees or beneficiaries is related to Griswold or Lillian. Respondent does not suggest this was other than an arm's-length transaction.

Only the loans of $25,000 to Griswold's brother and of $1,500 to Georgia Riggs are unexplained in terms of availability of other sources of funds to those borrowers. In view of the facts that these loans amounted to only 10 percent of Foundation's loans and that both loans were repaid in full with 6-percent interest and thereby provided more income to be used for charitable purposes (cf. *Best Lock Corporation*, 31 T.C. 1217, 1236–1237 (1959)), we conclude that petitioners have demonstrated Foundation was not being operated as a device for the substantial purpose of rendering financial aid to petitioners and related persons, as maintained by respondent.

Respondent and petitioners disagree as to whether the loans to petitioners and related persons were on more favorable terms than those available from banks. Petitioners point to the interest rates charged by Foundation. Respondent argues that inadequate security was afforded Foundation. The only difference between the security required by Foundation and that required by banks was that Griswold was required by banks to guarantee the loans of his controlled corporations.

We note Griswold's explanation that he, as trustee of Foundation, did not think it necessary to guarantee the loans of his controlled corporations since, in any event, he would not allow the memorial to his dead son to suffer because of defaults by his controlled corporations. Griswold and his controlled corporations had sufficient credit to obtain bank loans in amounts totaling more than twice the loans obtained by them from Foundation and these bank loans were obtained at lower rates of interest. The loans from Foundation and the interest thereon were all paid. Concededly, Griswold himself borrowed from banks $241,000 on no greater security than he gave on loans from Foundation during the same period and loans to Gris-

wold's nephew and the Anderson trust were adequately secured. Even if we assume (because petitioners have not adequately shown the contrary to be true) that the loans to Griswold's brother and Georgia Riggs were on more favorable terms than could be obtained by them from banks, substantially all the loans by Foundation were sufficiently secured or at rates of interest sufficiently unfavorable to the borrower that we conclude petitioners have sustained their burden of showing Foundation was organized and operated during those years exclusively for exempt purposes and not in order to provide economic benefit for petitioners and related persons.

Respondent points to the relatively low level of other charitable contributions by petitioners during those years and notes that petitioners could have accomplished the same ends by making direct gifts to the charitable organization to which Foundation made gifts and loans. Since the Internal Revenue Code does not require proof of absence of alternative methods of accomplishing charitable purposes, we gather that this argument is made to demonstrate an improper purpose on the part of petitioners. However, there is no necessary conflict between petitioners' actions and Griswold's avowed purpose "to create a living trust to continue to do good, and in effect, extend his [Sherry Griswold's] life purpose."

Respondent cites to us *John Danz*, 18 T.C. 454 (1952), affd. 231 F. 2d 673 (C.A. 9, 1953), and *Randall Foundation* v. *Riddell*, 244 F. 2d 803 (C.A. 9, 1957), for the proposition that "An organization whose primary activity is the carrying on of a trade or business for profit is not being operated exclusively for [exempt] purposes." In *Danz*, this Court held that "Among the purposes of the present trust during the taxable year was that of making money from the operation of retail candy stores and a hotel." 18 T.C. at 461. In *Randall*, the Foundation "was a trader of highly speculative oil stocks on the market." 244 F. 2d at 806. In the first year Randall Foundation made a net profit of approximately $40,000 but donated only $500 to other charities. In the second year, it made a net profit of approximately $50,000 and donated only $11,200 to other charities.

In the case at bar Foundation's loans were not so frequent and its charitable expenditures and loans not so minor in relation to its income as to justify the conclusion that a major purpose of its operations was to engage in a trade or business for profit. Consequently, we deem *Danz* and *Randall* distinguishable on their facts from the case now before us.

We conclude that petitioners have demonstrated that Foundation was an organization described in sections 23(o) and 23(q) of the 1939 Code and 170(c)(3) of the 1954 Code and that petitioners' contributions to Foundation during the taxable years in question were deductible by them under those provisions.

## *Issue 2.*

Respondent contends that the contributions to Foundation here at issue are made nondeductible by sections 3813(e) of the 1939 Code [11] and 503(e) of the 1954 Code (essentially a reenactment of section 3813(e) of the 1939 Code) because Foundation engaged in prohibited transactions, as defined by sections 3813(b) of the 1939 Code [12] and 503(c) of the 1954 Code (essentially a reenactment of section 3813(b) of the 1939 Code). However, section 3813(c)(2) of the 1939 Code [13] provides that:

TAXABLE YEARS AFFECTED.—An organization shall be denied exemption from taxation under section 101(6) by reason of paragraph (1) only for taxable years subsequent to the taxable year during which it is notified by the Secretary that it has engaged in a prohibited transaction, unless such organization entered into such prohibited transaction with the purpose of diverting corpus or income of the organization from its exempt purposes, and such transaction involved a substantial part of the corpus or income of such organization.

[11] SEC. 3813. REQUIREMENTS FOR EXEMPTION OF CERTAIN ORGANIZATIONS UNDER SECTION 101(6) AND FOR DEDUCTIBILITY OF CONTRIBUTIONS MADE TO SUCH ORGANIZATIONS.

(e) DISALLOWANCE OF CERTAIN CHARITABLE, ETC., DEDUCTIONS.—No gift or bequest for religious, charitable, scientific, literary, or educational purposes (including the encouragement of art and the prevention of cruelty to children or animals), otherwise allowable as a deduction under section 23(o)(2), 23(q)(2), * * * shall be allowed as a deduction if made to an organization which, in the taxable year of the organization in which the gift or bequest is made, is not exempt under section 101(6) by reason of the provisions of this section. With respect to any taxable year of the organization for which the organization is not exempt pursuant to the provisions of subsection (c) by reason of having engaged in a prohibited transaction with the purpose of diverting the corpus or income of such organization from its exempt purposes and such transaction involved a substantial part of such corpus or income, and which taxable year is the same, or prior to the, taxable year of the organization in which such transaction occurred, such deduction shall be disallowed the donor only if such donor or (if such donor is an individual) any member of his family (as defined in section 24(b)(2)(D)) was a party to such prohibited transaction.

[12] SEC. 3813. REQUIREMENTS FOR EXEMPTION OF CERTAIN ORGANIZATIONS UNDER SECTION 101(6) AND FOR DEDUCTIBILITY OF CONTRIBUTIONS MADE TO SUCH ORGANIZATIONS.

(b) PROHIBITED TRANSACTIONS.—For the purposes of this section, the term "prohibited transaction" means any transaction in which an organization subject to the provisions of this section—

(1) lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest, to;

(2) pays any compensation, in excess of a reasonable allowance for salaries or other compensation for personal services actually rendered, to;

(3) makes any part of its services available on a preferential basis to;

(4) makes any substantial purchase of securities or any other property, for more than adequate consideration in money or money's worth, from;

(5) sells any substantial part of its securities or other property, for less than an adequate consideration in money or money's worth, to; or

(6) engages in any other transaction which results in a substantial diversion of its income or corpus to;

the creator of such organization (if a trust); a person who has made a substantial contribution to such organization; a member of the family (as defined in section 24(b)(2)(D)) of an individual who is the creator of such trust or who has made a substantial contribution to such organization; or a corporation controlled by such creator or person through the ownership, directly or indirectly, of 50 per centum or more of the total combined voting power of all classes of stock entitled to vote or 50 per centum or more of the total value of shares of all classes of stock of the corporation.

[13] Sec. 503(a)(2) of the 1954 Code is essentially a reenactment of this provision.

Respondent concedes he has not given petitioners the notification contemplated by the statute. He relies upon the argument that many of Foundation's loans to petitioners and related persons were "without the receipt of adequate security and a reasonable rate of interest," "involved a substantial part of [Foundation's] corpus," and were entered into "with the purpose of diverting the corpus from its declared purpose of rendering financial aid to charitable foundations."

Petitioners contend that Congress merely intended to prohibit transactions which conferred unusual benefits upon a founder or contributor and which involved abnormal risks to the exempt organization. These loans, petitioners maintain, were not so intended and did not have that effect. Petitioners maintain the loans were adequately secured and at a reasonable rate of interest. Finally petitioners argue that there was no diversion of income or corpus from Foundation's exempt purposes and no intention to so divert.

We agree with petitioners that their deductions are not disallowed under the "prohibited transactions" provisions of the Codes, because we do not believe that the Foundation entered "into such prohibited transaction[s] with the purpose of diverting corpus or income of the organization from its exempt purposes" as required by sections 3813(c)(2) of the 1939 Code and 503(a)(2) of the 1954 Code.

Our decision is based upon the facts that Foundation's contributions and charitable loans exceeded its net income, the loans served the function of providing Foundation with the income it then devoted to charitable purposes, the loans were at higher rates of interest than those demanded of the borrowers by banks at those times, and upon our serious doubt as to whether these loans or any of them constituted prohibited transactions at the times when they were made.[14] We conclude from this, although our decision is not entirely free from doubt, that petitioners have shown the absence of a purpose of diverting a substantial part of Foundation's corpus or income from its exempt purposes.

On this issue we hold for petitioners.

### Issue 3.

Our disposition of the first two issues makes it unnecessary to make findings with regard to or otherwise discuss Issue 3.

---

[14] We have found nothing in the reported cases and little in the legislative history of these provisions which shed sufficient light on the question of whether the borrower's note can constitute "adequate security" under the circumstances before us.

Respondent's Income Tax Regs., sec. 1.503(c)–1(b)(1), provides that the "adequate security" requirement is not satisfied by evidence of the borrower's indebtedness. However, that regulation is, by its terms, not applicable to loans made before March 15, 1956, except for those loans still outstanding after January 31, 1957. Income Tax Regs., sec. 1.503(c)–1(b)(2). The regulation is thereby made inapplicable to Foundation's loans.

That the question of what constitutes adequate security remains perplexing is evidenced by comparison of the strict standards of sec. 1.503(c)–1(b)(1) with what is permitted under Rev. Rul. 62–183, 1962–2 C.B. 143.

### *Issue 4.*

Cla-Val concedes that, since it failed to make the election required by the relevant regulations (Regs. 118, sec. 29.23(q)–1(c)), its $9,500 contribution to Foundation on May 5, 1954, was not deductible under section 170(a)(2) of the 1954 Code for its taxable year ended March 31, 1954, and was erroneously deducted on its return for that taxable year. By amended petition, Cla-Val claims the $9,500 as a deduction for its taxable year 1955.

Respondent concedes the amount and date of the contribution in question, and the other facts which give us jurisdiction under sections 6511(b)(2) and 6512(b)(2) of the 1954 Code to allow the additional deduction even if it results in a determination of an overpayment. Respondent does not dispute the applicability of those provisions.

In view of our determination with regard to Issues 1 and 2, we hold that the contribution in question is deductible by Cla-Val for its taxable year 1955, subject to any limitations of section 170(b) of the 1954 Code that may be shown to be applicable upon a Rule 50 computation.

In view of our conclusion as to Issue 4 and since other matters involving the taxable years before the Court have been settled between the parties by stipulation, have been abandoned, or were not protested by petitioners,

*Decisions will be entered under Rule 50.*