CURT TEICH FOUNDATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CURT TEICH, SR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 938–65, 939–65.   Filed September 29, 1967.

*Crane C. Hauser*, *Calvin P. Sawyier*, and *Roger P. Eklund*, for the petitioners.

*Nelson E. Shafer*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in income and gift taxes as follows:

| Name | Docket No. | Year ended— | Income tax | Gift tax |
|---|---|---|---|---|
| Curt Teich Foundation | 938–65 | Aug. 31, 1959 | $151.31 | |
| | | Aug. 31, 1960 | 27,061.02 | |
| | | Aug. 31, 1961 | 148,602.16 | |
| | | Aug. 31, 1962 | 11,718.73 | |
| Curt Teich, Sr. | 939–65 | Dec. 31, 1960 | | $425,975.70 |

The issues for decision are:

(1) Did respondent properly revoke the exemption of Curt Teich Foundation for all or some of the years in question?

(2) Did Curt Teich, Sr.'s gift of securities to the Curt Teich Foundation qualify as a deductible charitable contribution on his 1960 gift tax return?

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Curt Teich Foundation (hereinafter referred to as the foundation) was organized under the laws of Illinois as a general corporation not for profit on September 26, 1951, by Curt Teich, Sr. (herein called Teich, Sr.), his late wife, Anna L. Teich, and their attorney, Ernest A.

Eklund. The foundation had its principal office in Chicago, Ill., at the time of filing its petition herein. It filed its information returns (Forms 990A) for the fiscal years ending August 31, 1959 through 1962, with the district director of internal revenue, Chicago, Ill.

Teich, Sr., was a resident of Chicago, Ill., at the time of filing his petition herein. He filed his gift tax return for 1960 with the district director of internal revenue, Chicago, Ill.

As stated in the foundation's articles of incorporation:

5. The purpose or purposes for which the corporation is organized, are: To the extent that such purposes are exclusively charitable, scientific or educational as follows: to aid, sponsor, promote and contribute to civic projects, community chests, scientific research and educational, philanthropic or eleemosynary institutions, societies, projects or organizations, to grant scholarships and funds to enable persons to study at schools or colleges, and to do or perform any or all such objects, either alone, or in cooperation with institutions, societies and organizations operated exclusively for charitable, scientific or educational purposes; to receive gifts, legacies and donations from any sources whatsoever; to make gifts and appropriations from any and all of its resources from time to time to carry out the objects and purposes of the corporation; and to exercise all such power and authority as may be necessary to carry out the purposes and objects above specified, but it is expressly declared that no dividend shall ever be declared or paid to any of its members, and that none of its property, real or personal, shall ever be used except in carrying into effect the legitimate ends and aims of its being.

On or about September 27, 1951, Teich, Sr., gave the foundation 900 shares of common stock of Curt Teich & Co. (herein referred to as the company), an Illinois corporation engaged in the specialty printing business and the sale of colored picture post cards. The foundation valued the shares at $360,000.

On November 28, 1952, a ruling was issued by the Assistant Commissioner of Internal Revenue that the foundation was exempt from Federal income tax under section 101(6) of the Internal Revenue Code of 1939.

During the fiscal year ended August 31, 1955, Teich, Sr., and Anna gave the foundation $2,000 in cash and 400 shares of M. A. Hanna Co. class A common stock and 200 shares of M. A. Hanna Co. class B common stock which were valued at $59,450 by the foundation.

During the fiscal year ended August 31, 1956, Teich, Sr., gave the foundation 125 shares of common stock of Hermitage Art Co., Inc., which were valued at $42,500 by the foundation.

On June 1, 1960, Teich, Sr., gave the foundation the following common stocks:

| Corporation | Number of shares | Value on June 1, 1960 [1] | Basis to Teich, Sr. | Value per gift tax return (Form 709) |
|---|---|---|---|---|
| Aluminum Co. of America | 500 | $44,150 | $12,493.81 | $42,375 |
| Chicago Title & Trust Co | 1,250 | 110,625 | 58,705.00 | 108,750 |
| City National Bank of Chicago | 1,000 | 77,875 | 35,112.28 | 75,000 |
| Continental Illinois National Bank & Trust Co. of Chicago | 1,000 | 111,750 | 67,929.84 | 111,500 |
| The First National Bank of Chicago | 10,000 | 657,500 | 211,157.25 | 645,000 |
| Standard Oil Co. of Indiana | 3,200 | 120,320 | 42,203.95 | 122,000 |
| Standard Oil Co of New Jersey | 2,400 | 100,620 | 72,844.35 | 99,000 |
| | | 1,222,840 | 500,446.48 | 1,203,625 |

[1] The values shown in this column are as determined by respondent in his deficiency notice and are not disputed by petitioner Curt Teich, Sr.

The letter from Teich, Sr., accompanying the delivery of these securities stated that the gift was made "with the understanding that the securities may be sold and exchanged for others." No similar provision had been made in connection with other gifts to the foundation. The gift was accepted by the foundation at a meeting of its board of directors on June 8, 1960. Of the above-indicated $1,203,625, $1,200,625 (total reported gifts less annual exclusion) was claimed as a charitable deduction on Teich, Sr.'s gift tax return for 1960. This deduction was denied by respondent and is in issue herein.

By a letter dated June 15, 1960, Walter Teich, a son of Teich, Sr., formally offered to sell his shares in the company to the foundation. A few weeks earlier, Walter had talked to his brother, Curt Teich, Jr., indicating that he was short of funds and inquiring whether the company would be interested in acquiring his stock.

On or about July 15, 1960, the foundation purchased 2,853 shares of common stock of the company for which it agreed to pay $400 per share as follows:

| Shareholder [1] | Relationship to Teich, Sr. | Shares | Purchase price |
|---|---|---|---|
| Curt Teich Trust No. 2 | | 1,000 | $400,000 |
| Beneficiaries: | | | |
| Curt Teich, Jr. | | | |
| Ralph Teich | | | |
| Louise Teich Chmelik | | | |
| Curt Teich, Jr | Son | 456 | 182,400 |
| Ralph Teich | Son | 384 | 153,600 |
| Walter Teich | Son | 404 | 161,600 |
| Louise Teich Chmelik | Daughter | 384 | 153,600 |
| Raymond Chmelik, Jr | Grandson | 45 | 18,000 |
| James L. Chmelik | Grandson | 45 | 18,000 |
| Susan A. Chmelik | Granddaughter | 45 | 18,000 |
| Christine L. Chmelik | Granddaughter | 45 | 18,000 |
| June Teich | Granddaughter | 45 | 18,000 |
| | | 2,853 | 1,141,200 |

[1] The shareholders of record with respect to the shares attributed to the Chmeliks and June Teich were a series of trusts for their benefit

The fair market value of said stock was at least $400 per share. Payment for said 2,853 shares was made in September 1960. Following such purchase, all of the 3,943 issued and outstanding shares of common stock of the company were owned by the foundation (3,753 shares) and Teich, Sr. (190 shares). The 2,853 purchased shares had been acquired by the respective shareholders by gifts from Teich, Sr., and Anna L. Teich, with the exception of 25 shares which had been purchased in 1943 by Curt Teich, Jr., from Teich, Sr.

The acquisition of the company stock was financed by the sales of the following securities in August and September of 1960:

| Corporation | Shares sold | Net proceeds of sale |
|---|---|---|
| Chicago Title & Trust Co | 1,250 | $104,958.00 |
| City National Bank of Chicago | 1,000 | 71,721.32 |
| Continental Illinois National Bank & Trust Co. of Chicago | 1,000 | 113,454.60 |
| The First National Bank of Chicago | 10,000 | 649,740.00 |
| Standard Oil Co. of Indiana | 3,200 | 121,906.50 |
| Standard Oil Co. of New Jersey | 200 | 8,134.42 |
| Hanna Mining Co | 38 | 3,532.60 |
| M. A. Hanna Co | 200 class A | 19,442.24 |
| | 100 class B | 9,721.12 |
| Sun Ray Mid Continent Oil Co | 100 | 2,231.90 |
| Phillips Petroleum Co | 1,000 | 46,555.26 |
| | $5M bond | 5,460.00 |
| | | 1,156,857.96 |

During the entire fiscal year ended August 31, 1960, the foundation had the following directors and officers:

| Name | Relationship to Teich, Sr. | Offices |
|---|---|---|
| Curt Teich, Sr | | President, treasurer, and director. |
| Curt Teich, Jr | Son | Vice president and director. |
| Walter Teich | Son | Director. |
| Ralph Teich | Son | Director. |
| Charles F. Horne | None | Secretary and director. |

Throughout its existence, the company has been engaged in the business of printing and selling picture post cards and related items. Its product was of superior quality. For a number of years prior to July 1960, it had been an important company in its field.

From time to time, the company was required, by competitive business conditions, to change the process by which the cards were produced.

In the mid-1950's the company adopted the Curteich color 3–D process. In so doing, it incurred considerable expenses for rephotographing and making new plates, which expenses were charged currently against the company's profits. As a result, the company sustained losses during the years 1958 through 1961. By 1961, the changeover to the 3–D process had been completed, and the company once again began to realize profits, although operating profits were not realized until 1964.

The following table reflects the net income earned by the company and the dividends paid by it:

| Year | Profit (or loss) from operations—per audit reports | Net profit (or loss) per books—including surplus adjustments (rounded off to nearest thousand) | Taxable income (or loss) per tax returns [1] | Dividends paid |
|---|---|---|---|---|
| 1950 | | $109,000 | | $45,000.00 |
| 1951 | | 98,000 | | 40,000.00 |
| 1952 | | 81,000 | | 40,000.00 |
| 1953 | | 2,000 | | |
| 1954 | | (14,000) | | |
| 1955 | | 38,000 | | 20,000.00 |
| 1956 | | 37,000 | | 20,000.00 |
| 1957 | $59,675.92 | 64,000 | | 40,000.00 |
| 1958 | (59,615.81) | (13,000) | | |
| 1959 | (30,182.38) | (6,000) | | |
| 1960 | (114,919.09) | (123,000) | | |
| 1961 | (34,804.92) | (3,000) | | |
| 1962 | (8,285.28) | 15,000 | ($12,239.96) | |
| 1963 | (6,857.75) | 23,000 | (9,434.23) | 19,715.00 |
| 1964 | 21,922.40 | 55,000 | 23,021.27 | 49,287.50 |
| 1965 | 22,753.43 | 64,000 | 29,442.26 | 59,145.00 |

[1] Most of the difference between the profit or loss as shown by the books and as shown by the tax returns results from the nonincludability for tax purposes of interest on municipal bonds. The remaining differences are not important herein and are appropriately reconciled each year on Schedule M of the company's return.

The following schedule sets forth condensed balance sheets of the company as of June 30, 1960, and December 31, 1960 through 1965, with the figures shown to the nearest $1,000:

| | 6/30/60 | 12/31/60 | 12/31/61 | 12/31/62 | 12/31/63 | 12/31/64 | 12/31/65 |
|---|---|---|---|---|---|---|---|
| **Current assets:** | | | | | | | |
| Cash | $98,000 | $89,000 | $181,000 | $93,000 | $39,000 | $43,000 | $4,000 |
| Receivables (net) | 533,000 | 447,000 | 448,000 | 420,000 | 408,000 | 385,000 | 328,000 |
| Accrued interest receivable | 11,000 | 8,000 | 8,000 | 9,000 | 10,000 | 11,000 | 12,000 |
| Inventories | 190,000 | 209,000 | 177,000 | 188,000 | 183,000 | 198,000 | 201,000 |
| Securities (at cost) | 581,000 | 522,000 | 448,000 | 420,000 | 491,000 | 617,000 | 581,000 |
| U.S. Treasury bills | | | | 149,000 | 149,000 | 149,000 | 198,000 |
| Prepaid items | 27,000 | 37,000 | 38,000 | 34,000 | 27,000 | 16,000 | 11,000 |
| Reserve funds: | 1,440,000 | 1,312,000 | 1,300,000 | 1,313,000 | 1,307,000 | 1,419,000 | 1,335,000 |
| Sinking fund securities (at cost) | 213,000 | 281,000 | 304,000 | 359,000 | 410,000 | 334,000 | 403,000 |
| Net fixed assets | 236,000 | 217,000 | 179,000 | 147,000 | 127,000 | 111,000 | 104,000 |
| Total assets | 1,889,000 | 1,810,000 | 1,783,000 | 1,819,000 | 1,844,000 | 1,864,000 | 1,842,000 |
| Current liabilities | $45,000 | $72,000 | $47,000 | $68,000 | $90,000 | $105,000 | $78,000 |
| **Net worth:** | | | | | | | |
| Capital stock | 670,000 | 670,000 | 670,000 | 670,000 | 670,000 | 670,000 | 670,000 |
| Earned surplus | 1,174,000 | 1,068,000 | 1,066,000 | 1,081,000 | 1,084,000 | 1,089,000 | 1,094,000 |
| Total net worth | 1,844,000 | 1,738,000 | 1,736,000 | 1,751,000 | 1,754,000 | 1,759,000 | 1,764,000 |
| Total liabilities and net worth | 1,889,000 | 1,810,000 | 1,783,000 | 1,819,000 | 1,844,000 | 1,864,000 | 1,842,000 |

In October 1960, Teich, Sr., gave the foundation a 1957 Oldsmobile sedan which was valued by the foundation at the time of transfer at $1,445. The gift was conditioned upon Teich, Sr's, retaining limited use of the automobile when not used by the foundation. In 1961, the foundation traded in the Oldsmobile on a used 1961 Cadillac sedan,

paying an additional $4,396 therefor. At the time of the gift of the Oldsmobile, Teich, Sr., was approximately 85 years old, resided in Florida, and was president and a director of the foundation. Because of Teich, Sr.'s age, he was unable to own, or to secure insurance on, an automobile. After the date of the transfer of the Oldsmobile, Teich, Sr., continued to use it, and later the Cadillac, for personal purposes. He also used them for visiting potential beneficiaries of charitable gifts by the foundation. The foundation paid for the license fee and insurance on the automobiles, while Teich, Sr., paid all other operating and maintenance costs with respect to the automobiles. Teich, Sr., has never received any cash remuneration for his services to the foundation.

The following table reflects the income, expenses, and charitable contributions of the foundation:

| Fiscal year ended Aug. 31— | Gross ordinary income for the year | Cumulative gross ordinary income | Expenses | Charitable contributions | Retained income | Percent of income retained to cumulative ordinary income |
|---|---|---|---|---|---|---|
| 1952 | $9,000.00 | $9,000.00 | $1.00 | $5,600.00 | $3,399.00 | 37.8 |
| 1953 | 9,000.00 | 18,000.00 | 842.76 | 1,815.00 | 9,741.24 | 54.1 |
| 1954 | | 18,000.00 | 38.50 | 70.00 | 9,632.74 | 53.5 |
| 1955 | 725.00 | 18,725.00 | 26.00 | 455.00 | 9,876.74 | 52.7 |
| 1956 | 6,575.00 | 25,300.00 | 51.15 | 4,260.00 | 12,140.59 | 48.0 |
| 1957 | 10,575.35 | 35,875.35 | 368.50 | 4,235.00 | 18,112.44 | 50.5 |
| 1958 | 13,334.50 | 49,209.85 | 470.80 | 8,830.00 | 22,146.14 | 45.0 |
| 1959 | 4,010.10 | 53,219.95 | 471.80 | 3,504.50 | 22,179.94 | 41.7 |
| 1960 | 7,195.92 | 60,415.87 | 1,864.70 | 14,082.00 | 13,429.16 | 22.2 |
| 1961 | 13,501.30 | 73,917.17 | 1,520.45 | 9,570.00 | 15,840.01 | 21.4 |
| 1962 | 6,186.30 | 80,103.47 | 1,618.28 | 4,910.00 | 15,498.03 | 19.3 |
| 1963 | 4,587.60 | 84,691.07 | 10,078.18 | 8,650.00 | 1,357.45 | 1.6 |
| 1964 | 23,650.80 | 108,341.87 | 4,347.12 | 21,620.00 | (958.87) | |
| 1965 | 52,426.24 | 160,768.11 | 3,600.41 | 49,000.00 | (1,133.04) | |
| 1966 | 61,896.01 | 222,664.12 | 2,024.82 | 62,350.00 | (3,611.85) | |

In its information returns (Forms 990A) for its fiscal years ended August 31, 1960 and 1961, the foundation incorrectly answered "No" to the question whether a lineal descendant of a contributor to the foundation had sold any securities to the foundation. The returns were prepared by independent public accountants for the foundation and the company, who also prepared audit reports for the foundation and the company for these years, and were signed by Teich, Jr., in reliance upon the accountants. On or about January 30, 1962, respondent initiated an examination of the foundation's information returns for the fiscal years ended August 31, 1959, 1960, and 1961. The 1960 transaction with respect to the foundation's acquisition of the company's stock was first disclosed following the commencement of respondent's examination.

On September 16, 1963, respondent notified the foundation that its tax-exempt status was retroactively revoked, commencing with the fiscal year ended August 31, 1959.

OPINION

Respondent attacks the exemption of the foundation from two positions:

(1) Under section 501(c)(3),[1] it was not "operated exclusively" for charitable purposes and its net earnings inured, in whole or in part, to the benefit of private individuals. In the event that we should agree with him in these respects, respondent further contends that his action in retroactively revoking the foundation's exemption was proper.

(2) Under section 504(a), it unreasonably accumulated its income and invested such income in such a manner as to jeopardize the carrying out of its alleged exempt purposes. In this connection, respondent concedes that the disallowance of the foundation's exemption under section 504(a) would not operate retroactively to deprive Teich, Sr., of a gift tax deduction for 1960.[2]

We will deal separately with each of these claims.

## *Issue No. 1*

At the outset, we think it helpful if we outline briefly the scenario of our decision. The major plot involves a sequence of transactions beginning with Teich, Sr.'s donation of June 1, 1960, of approximately $1.2 million in diversified so-called blue chip securities under circumstances which contemplated the subsequent sale thereof. On or about July 15, 1960, the foundation purchased from various members of the Teich family (not including Teich, Sr.) 2,853 shares of the common stock of the company for $400 per share, or an aggregate purchase price of $1,141,200. Together with its prior holdings, the foundation thereby became the owner of all the issued and outstanding common stock of the company, with the exception of 190 shares which Teich, Sr., continued to own. The shares so purchased by the foundation were paid for in cash in September 1960, derived entirely out of the net proceeds of $1,156,857.96 from the sale in August and September 1960 of the above-mentioned blue chip securities (with the exception of 500 shares of Aluminum Co. of America and 2,200 shares of Standard Oil Co. of New Jersey) and certain other securities previously acquired by the foundation. The minor plot in the scenario involves the transfer of an atuomobile by Teich, Sr., to the foundation

---

[1] All references are to the Internal Revenue Code of 1954, unless otherwise specified.

[2] As a technical matter, Teich, Sr.'s gift tax deduction turns upon the question whether the foundation was "a corporation * * * operated exclusively for * * * charitable * * * purposes" within the meaning of sec. 2522(a)(2), but, since the foregoing language is the same as that contained in sec. 501(c)(3), we have posited our discussion under the latter section. Respondent does not question the fact that the foundation qualified under sec. 501(c)(3) for its taxable years 1952 through 1958. Nor does he make any claim that the foundation was a feeder organization disqualified under sec. 502 or that it at any time engaged in a prohibited transaction within the meaning of sec. 503.

in October 1960 and his use of such automobile and a successor auto-mobile acquired in 1961 by the foundation through a trade-in.

Respondent's principal thrust is that the 1960 securities transactions resulted in the use of the foundation for the substantial purpose of benefiting the Teich family by serving as a convenient vehicle to—

(a) Reduce Teich, Sr.'s estate tax liability through the gifts of the so-called blue chip securities;

(b) Avoid Teich, Sr.'s liability for tax on the more than $700,000 gain which he would have realized if he, instead of the foundation, had sold those securities; [3]

(c) "Bail out" the Teich family from having to hold what respond-ent categorizes as "unpredictable Teich Co. stock," although respond-ent has stipulated that the fair market value of the shares was *at least* equal to the price paid by the foundation, i.e., $400 per share;

(d) Permit the Teich family to retain control of the company through the foundation;

(e) Provide an immediate source of funds to Walter Teich.

Respondent's arguments on brief are predicated on alternative, and seemingly inconsistent, theories respecting the 1960 securities trans-actions. Sometimes he treats the gift of the so-called blue chip securi-ties and the subsequent sale thereof and purchase of the company stock as unrelated events. At other times, he treats them as integrated ele-ments of a preconceived unitary plan. If it were necessary for us to do so, we would be strongly inclined to find that the gift and the purchase were part and parcel of such a plan. But, in our opinion, a choice between respondent's two theories is not a prerequisite to decision herein.

If the gift and purchase are viewed separately, the argument can be made that the foundation should not have transferred its holdings from so-called blue chip securities to stock of a closely held company. But the fact remains that the donated securities provided the foundation with an additional $1.2 million in assets and that the foundation's wealth remained substantially, if not equally, increased after the ac-quisition of the company stock. We are not prepared to say that the transformation of such increased wealth per se operated to destroy the foundation's exemption. To be sure, in 1960 the company was in the throes of a major changeover in its manufacturing process and, as a result, it had suffered operating losses in immediately preceding years—a condition from which it did not recover until 1964. But its product was of superior quality and it was an important—perhaps

[3] We note that respondent asserts no claim in this proceeding that Teich, Sr., should be held taxable on any gain on the grounds either that the foundation was his agent in the sale of securities donated in June 1960 or that the substance of the transactions was a purchase of the company stock by Teich, Sr., from members of his family and a gift of such stock by him to the foundation.

dominant—company in its field. It had operated profitably and paid substantial dividends in the not-too-distant past and could reasonably be expected to reestablish its profitability and to pay such dividends in the relatively near future—in fact, as our findings of fact indicate, it did so some 3 years or so later.

We recognize that the lack of dividends from the company stock in the years immediately following 1960 seems to compare unfavorably with a projection of dividends which the foundation would have received if it had retained the so-called blue chip securities. But dividends are never guaranteed, and who is to say that the amount of dividends that might be expected to be received from the company in several ensuing years was likely to be less than the amount which might be anticipated from the donated securities? [4] The same observation applies to the fact that the donated securities would have appreciated in value, particularly since we have no evidence that there was not a comparable appreciation in the value of the company stock. In this connection, it is also relevant that respondent's concession as to the 1960 value fixed *only a minimum* and not the precise fair market value at that time. We recognize that it does not automatically follow from a concession on the part of respondent of the fairness of the price paid that the investment is nevertheless justified where a question of charitable exemption is involved. But, on the evidence presented herein, we are satisfied that the company stock did not represent a sufficiently speculative, risky, or, as respondent puts it, "unpredictable" investment to support a finding that the foundation was not warranted in making a switch in its holdings. Not only were the company's operations promising, but the foundation's investment of $1.14 million had an ample protective cushion by virtue of the approximately $800,000 in marketable stocks and bonds which the company had in its portfolio on June 30, 1960, and continued to hold in even larger amounts.

The result is the same if we view the 1960 securities transactions as part of a preconceived unitary plan. The undisputed fact is that the foundation still had $1.2 million more in assets than it had before the transfer of the donated securities. Even if the company stock depreciated thereafter in value—a highly unlikely possibility in view of the large amount of common stocks and bonds held by the company—the foundation would still be ahead of the game. Cf. *Samuel Friedland Foundation* v. *United States*, 144 F. Supp. 74 (D.N.J. 1956). Indeed, even if the company stock became worthless, the foundation could not be worse off, since at no point did the foundation risk its assets in order to pay for the stock; the donated securities produced

---

[4] Respondent submitted evidence only as to the dividends which would have been received on the so-called blue chip securities in 1960 and 1964. There is no indication of the amount of such dividends in 1961, 1962, and 1963. We note also that the $50,000 which would have thus been received in 1964 is about the same as the $49,287.50 in dividends paid by the company in that year.

972

more than enough to pay for the stock. And, on the hypothesis of an integrated arrangement, the alleged dangers of substitution of investment cannot be considered.

Clearly the estate and capital gains tax savings to Teich, Sr., are not sufficient reason for denying the exemption. *William Waller*, 39 T.C. 665 (1963). Nor do we think it material that a major motivating factor may have been to "bail out" generally the Teich family and to benefit particularly Walter Teich, who wanted to sell his company stock to raise needed cash. Respondent attempts to distinguish *Waller* on the ground that the advantages to the charitable fund in that case at no risk to itself, equaled the amount of the charitable contribution claimed by the taxpayer. But when the 1960 securities transactions involved herein were completed, the foundation was richer and the Teich family poorer by $1.2 million. Thus, in point of fact, we have the same situation herein as existed in *Waller*, with the result that that case is closely analogous rather than distinguishable.

Respondent relies heavily on *Leon A. Beeghly Fund*, 35 T.C. 490 (1960), affirmed on other grounds 310 F. 2d 756 (C.A. 6, 1962), and *Stevens Bros. Foundation, Inc.*, 39 T.C. 93 (1962), affirmed as to the issue involved herein 324 F. 2d 633 (C.A. 8, 1963). We do not agree that these cases are controlling. In *Beeghly*, the fund acquired, for $11 million on which a downpayment of only $369,800 was made, stock of Cold Metal Process Co., a closely held corporation, the only assets of which consisted of a subsidiary and certain patent rights which were the subject of extensive, complicated, expensive, and uncertain litigation. The creator of the charitable fund and his family held the majority of the shares sold. As part of the transaction, the subsidiary was immediately resold for $1,250,000 to a group of former stockholders, with a downpayment of $375,000 which was used to cover the downpayment on the $11 million obligation. In addition to so obligating itself, the fund undertook to pay sizable expenses in connection with the litigation. Prior to entering into this transaction, the fund's sole assets consisted of 151 shares of the Cold Metal Process Co., dividend notes from the company in the amount of $2,250, and $19.58 in cash. On these facts, we found that the transaction was extremely speculative and that, by engaging therein, the fund had placed the purpose of benefiting the shareholders of Cold Metal Process Co. ahead of its purported charitable purposes. Consequently, we sustained the revocation of the fund's exemption on the ground that it was not being operated exclusively for charitable purposes.

In *Beeghly*, it is obvious that the fund incurred substantial risk of loss. Indeed, in distinguishing other cases (*Alan Levin Foundation*, 24 T.C. 15 (1955), and *Ohio Furnace Co.*, 25 T.C. 179 (1955)), we emphasized this distinguishing factor. And we again pointed up this

distinction in *William Waller, supra* at 676. To be sure, in *Beeghly*, the risk of loss was realistically limited because, if the fund was unable to carry out its obligations, the assets at risk beyond those involved in the tainting transaction were minimal. But the fact is that they were at risk and, more importantly, there was "no assurance that the trust [fund] would ever actually realize anything for itself." See 35 T.C. at 519. This is a far cry from the situation herein, where the risk of nonrealization by the foundation on the company stock was minimal, if not completely nonexistent. So are the commercial projects, and the risks to which the taxpayer subjected its assets, which formed the setting involved in *Stevens Bros. Foundation, Inc., supra*, with the result that this case is also clearly distinguishable.

We return to the fundamental facts which underpin the instant situation. The foundation, without any risk to its previously held assets, acquired, and paid a fair price for, a sound investment in the company, which offered the prospect of substantial earnings to finance its charitable activities. When the 1960 securities transactions were completed, the foundation was in no worse position in the immediate future, and could reasonably expect to be in a greatly improved position in the foreseeable future, to carry out its charitable activities. Unquestionably, these transactions aided members of the Teich family. But, as we pointed out in *Donald G. Griswold*, 39 T.C. 620, 636 (1962), acq. 1965-1 C.B. 4, "Normally, any transaction is an aid to each of the parties involved, otherwise the parties would not have entered into the transaction." Cf. Rev. Rul. 66-358, 1966-2 C.B. 218.

We also think the history of legislative attempts to deal with transactions involved herein should not be ignored. When the provisions of the Revenue Act of 1950 with respect to the activities of exempt organizations were under consideration, the House bill specifically prohibited dealings between foundation and their creators regardless of the fairness of the price involved. H.R. 8920, 81st Cong., 2d Sess., sec. 301(c) (1950); H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 42, 124 (1950). The Senate, however, felt that such a provision was unnecessarily harsh and adopted a provision relating to "prohibited transactions," which was finally enacted and is now found in section 503. S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 36, 123 (1950); H. Rept. No. 3124, 81st Cong., 2d Sess., p. 15 (1950). In subsequent years, Congress again considered the problem but confined its attention to limited types of organizations. Thus, in 1962, when provisions relating to the exemption of self-employed pension plans were enacted, an absolute prohibition against sales and purchases of property between exempt foundations and the creators and families of creators was included. Pub. L. 87-792, sec. 6 (Oct. 10, 1962). And a similar absolute prohibition found its way into the 1964 modification of the provisions dealing with unlimited charitable contributions. Pub. L. 88-272, sec. 209(b)

(Feb. 26, 1964). Finally, in 1965, the Treasury Department in a report to the Senate Committee on Finance recommended legislation applying a general prohibition on such transactions.[5] Treasury Department Report on Private Foundations, Committee Print, 89th Cong., 1st Sess., pp. 15–23 (Feb. 2, 1965). No such recommended legislation has yet been introduced, much less enacted. Concededly, we are not limited by the "prohibited transactions" specified in section 503 in determining whether the foundation was operated for a substantial nonexempt purpose. See *Donald G. Griswold, supra* at 636, fn. 9. But we are reluctant to impose the degree of purity between the Teich family and the foundation advocated herein by respondent by extending the application of existing standards to a type of situation which Congress has considered and thus far has been reluctant to include in the statutory framework. See *Commissioner v. Brown*, 380 U.S. 563, 578–579 (1965); Riecker, "Foundations and the Patman Committee Report," 63 Mich. L. Rev. 95 (1964); Young, "Donor Foundation Dealings," 22d Ann. N.Y.U. Tax Inst. 965 (1964).

Under the circumstances of this case, we do not believe that the 1960 securities transactions evinced such a substantial nonexempt purpose as to compel us to apply the injunction of *Better Business Bureau v. United States*, 326 U.S. 279 (1945), and hold that the foundation was not "operated exclusively" for a charitable purpose within the meaning of section 501(c)(3). The investment was merely incidental to the charitable activities of the foundation. Cf. *Donald G. Griswold, supra; Alan Levin Foundation, supra; Bright Star Foundation, Inc. v. Campbell*, 191 F. Supp. 845 (N.D. Tex. 1960).

Nor do we think that Teich, Sr.'s subsequent use of the automobile he gave to the foundation and the replacement automobile acquired by the foundation requires us to hold otherwise. The allocation of the costs of operations was reasonable in light of the portion of time the automobiles were used for foundation purposes. Although we think that the foundation used questionable judgment in engaging in this transaction, any excess benefit to Teich, Sr., was of a *de minimis* nature. Similarly, the fact that the foundation incorrectly answered "No" to the question of its Form 990A whether it had bought any securities from a lineal descendant of a contributor does not alter our conclusion. It has no bearing in view of our holding that the 1960 securities transactions did not have a "tainting" effect. Obviously, we have no occasion to decide the retroactive effect of such misstatement if our principal conclusion had been otherwise. Cf. *Lesavoy Foundation v. Commissioner*, 238 F. 2d 589 (C.A. 3, 1956), reversing 25 T.C. 924 (1956); Rev. Rul. 59–95, 1959–1 C.B. 627.

---

[5] Interestingly, the Treasury Department gave, as an example of a problem child in this area, a situation which appears to reflect the salient facts of this case. See Treasury Department Report at page 20, example 11.

## Issue No. 2

We turn to respondent's attack under section 504(a) [6] on the foundation's accumulation of income. We have set forth in our Findings of Fact a table indicating the earnings of the foundation and the amount of income accumulated by it. [7] At the end of each of its fiscal years 1959 through 1962, the total income accumulated by the foundation was, respectively, $22,179.94, $13,429.16, $15,840.01, and $15,498.03. These sums represented, respectively, 41.7 percent, 22.2 percent, 21.4 percent, and 19.3 percent of the cumulative income earned by the foundation. Petitioners argue that the accumulations are justifiable inasmuch as the percentages allowed are less than the percentages allowed in *A. Shiffman*, 32 T.C. 1073 (1959); *Samuel Friedland Foundation* v. *United States, supra;* and *Hulman Foundation, Inc.* v. *United States*, 217 F. Supp. 423 (S.D. Ind. 1962). In so arguing, petitioners misconstrue these cases. In all of these cases, the basis for sanctioning the accumulations was that the charity in question had a preconceived plan justifying the accumulation, which is not the case herein. The numbers game which foundation's counsel seeks to play is simply not applicable.

The testimony as to the existence of a plan to justify the substantial accumulations herein was vague and inconclusive. Though there was some testimony indicating that, at some point in time, the foundation hoped to set up scholarship funds at two universities, for aught that appears in the record, this intention arose after respondent questioned the accumulation by the foundation. "The program must be prospective and not occur to the organization only after the Commissioner's shadow becomes visible." *Erie Endowment* v. *United States*, 316 F. 2d 151, 155 (C.A. 3, 1963); cf. *Danforth Foundation* v. *United States*, 347 F. 2d 673 (C.A. 8, 1965); *Stevens Bros. Foundation, Inc., supra.*

The minutes of the foundation contained no reference to a plan to accumulate sufficient funds to establish self-sustaining scholarships. There was no written evidence through letters or otherwise of a

---

[6] SEC. 504. DENIAL OF EXEMPTION.

(a) GENERAL RULE.—In the case of any organization described in section 501(c)(3) to which section 503 is applicable, exemption under section 501 shall be denied for the taxable year if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—

(1) are unreasonable in amount or duration, in order to carry out the charitable, educational, or other purpose or function constituting the basis for exemption under section 501(c)(3); or

(2) are used to a substantial degree for purposes or functions other than those constituting the basis for exemption under section 501(a) of an organization described in section 501(c)(3); or

(3) are invested in such a manner as to jeopardize the carrying out of the charitable, educational, or other purpose or function constituting the basis for exemption under section 501(a) of an organization described in section 501(c)(3).

[7] We have excluded capital gains from the calculation of accumulated income. Sec. 1.504–1(c), Income Tax Regs.

scholarship plan. And, during the taxable years before us, there was only a $500 contribution to one of the institutions at which it is claimed the scholarship funds were established.

To be sure, during its fiscal years 1959 through 1962 the foundation expended an aggregate amount for charitable purposes ($32,066.50) in excess of its net income ($25,418.39). But, at the beginning of the period it had accumulated income of $22,146.14, almost twice its highest net income during any previous years. Admittedly, the legislative history of section 504 clearly indicates that some flexibility was intended in applying the test of unreasonableness. H. Rept. No. 2319, *supra* at 40, 121; S. Rept. No. 2375, *supra* at 33, 125; H. Rept. No. 3124, *supra* at 15–16; Treasury Department Report, *supra* at 23–30. Obviously, a precise standard of measurement is not feasible. But, in the absence of a specific plan or other meaningful indication, we think that the accumulation at the beginning of the period in question of an amount almost twice as large as the foundation's highest net income during any previous year and of an amount equal to more than such highest net income at the end of the period fails to meet the statutory requirement.

## Conclusion

We hold that the foundation should not be denied its exemption during any of the years in question by reason of any failure to meet the "exclusive" requirement of section 501(c)(3) but that it should be denied such exemption for its fiscal years 1959 through 1962 because the amount of its accumulated income was "unreasonable" within the meaning of section 504(a). Our holding that the latter section applies to the foundation is not, however, sufficient reason, as respondent concedes, for disallowing Teich, Sr.'s gift tax deduction with respect to the securities donated to the foundation in June 1960.

Our holdings make it unnecessary to consider various alternative contentions of respondent respecting the validity of his action in retroactively revoking the foundation's exemption because of non-compliance with section 501(c)(3); whether such revocation, insofar as it was based on the 1960 securities transaction, would have been effective to deny the gift tax deduction of Teich, Sr.; and whether the investment of the foundation's accumulated income was accomplished in such a manner as to jeopardize the carrying out of its alleged exempt purposes within the meaning of section 504.[8]

Reviewed by the Court.

> *Decision will be entered for the respondent in docket No. 938–65.*
>
> *Decision will be entered for the petitioner in docket No. 939–65.*

---

[8] Our analysis of the 1960 securities transactions under sec. 501(c)(3) would appear to answer the jeopardy issue in the negative.

DAWSON, *J.*, dissenting: I respectfully dissent as to issue No. 2. Admittedly, the statute affords very little help in answering the question: What is an unreasonable accumulation? Nor are the regulations any more helpful since section 1.504–(b) (1) merely provides that:

Amounts accumulated out of income become unreasonable when more income is accumulated than is needed, or when the duration of the accumulation is longer than is needed in order to carry out the purpose constituting the basis of the organization's exemption. * * *

Indeed, the nebulous nature of the "unreasonable" accumulation concept used in section 504(a) prompted the Court of Appeals for the Third Circuit in *Erie Endowment* v. *United States*, 316 F. 2d 151, 155, to say:

"Reasonableness," that hobgoblin of judicial minds, can only be divined on the basis of all relevant facts. The standard to be applied is whether the taxpayer can justify the total accumulation of income at the end of the taxable year, in terms of both time and amount, on the basis of *a rational total program of charitable intent.* The plan must be viewed in its entirety. * * * [Emphasis added.]

I would apply this standard flexibly so as not to tie the hands of charitable foundations so tightly that no room is left for practical administration of its "total program of charitable intent."

Here the foundation's articles provided for a *general program* of scholarships, and the evidence, even if regarded by the majority of my colleagues as weak, establishes that part of the foundation's income was accumulated in order to implement such a program. The foundation has created scholarship funds at Massachusetts Institute of Technology, Valparaiso University, and Northwestern Military Academy. And another scholarship fund is in the process of being established at Trinity College. Each of the scholarship funds at Massachusetts Institute of Technology and Valparaiso University now aggregates about $15,000.

In my opinion other significant factors are (1) that the accumulated income of the foundation rose from $3,399 on August 31, 1952, to a high of $22,179.94 on August 31, 1959, and declined to a deficit by August 31, 1964; (2) that over the 14-year period from 1952 to 1966 the foundation has made charitable contributions totaling $198,951.50; and (3) that to subject the foundation to the tax deficiencies here asserted for the years 1959 through 1962 will cause the tax burden to fall upon income which has already been fully distributed for charitable purposes. Therefore, I would hold that the accumulations were reasonable in amount and duration to carry out the foundation's charitable purposes. Cf. *A. Shiffman*, 32 T.C. 1073 (1959) ; *Samuel Friedland Foundation* v. *United States*, 144 F. Supp. 74 (D.N.J. 1956) ; and *Hulman Foundation, Inc.* v. *United States*, 217 F. Supp. 423 (S.D. Ind. 1962).

DRENNEN, *J.*, agrees with this dissent.