JOSEPH B. GROSSMAN and ESTHER S. GROSSMAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Grossman v. Commissioner
Docket Nos. 5314-70, 5315-70, 5316-70, 5367-70 thru 5372-70.
United States Tax Court
T.C. Memo 1973-219; 1973 Tax Ct. Memo LEXIS 69; 32 T.C.M. (CCH) 1013; T.C.M. (RIA) 73219; October 4, 1973, Filed *69 Petitioners executed a contract to purchase property and made the downpayment with 2 borrowed funds. Four days later, the contract was assigned to a charitable family trust, subject to the payment by the trust of the full purchase price. Held, the purchase and subsequent transfer to the charitable family trust were not sham transactions. Held further, the fair market value of the property determined. Harry K. Mansfield and Thomas G. Dignan, Jr., for the petitioners. Barry J. Laterman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined the following deficiencies in the Federal *70 income taxes of the petitioners for the year 1964: Docket No.
Petitioner Deficiency 5314-70
Joseph B. Grossman and Esther S. Grossman
$6,307.09
5315-70
Maurice Grossman and Marilyn Grossman
6,800.49
5316-70
Morton S. Grossman and Sylvia K. Grossman
6,352.29
5367-70
Joseph B. Grossman II and Jean A. Grossman
6,520.10
5368-70
Estate of Reuben A. Grossman, Deceased, Nissie Grossman, Executor, and Mary S. Grossman
5,861.32
5369-70
Bernard D. Grossman and Grace S. Grossman
$6,902.33
5370-70
Nissie Grossman and Estate of Ethel Grossman, Deceased, Nissie Grossman, Executor
6,905.01
5371-70
Everett P. Grossman and Naomi Grossman
6,800.85
5372-70
Sidney W. Grossman and Frances A. Grossman
6,867.12 3 The petitioners have conceded certain adjustments in the notices of deficiency; two issues remain for decision. Initially, we must decide whether a contract to purchase property made by one member of the family on behalf of the other members of the family and its transfer 4 days later to a charitable family trust lacked substance and should be treated as a purchase directly by the trust. In the event we determine that the contract and transfer *71 had substance, we must determine the fair market value of the property right transferred. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Each of the petitioners was a resident of the State of Massachusetts when the petition was filed in this case. For the year 1964, joint Federal income tax returns were 4 filed with the district director of internal revenue for the district of Massachusetts by: Joseph B. and Esther S. Grossman, husband and wife; Maurice and Marilyn Grossman, husband and wife; Morton S. and Sylvia K. Grossman, husband and wife; Joseph B. II and Jean A. Grossman, husband and wife; Reuben A. and Mary S. Grossman, husband and wife; Bernard D. and Grace S. Grossman, husband and wife; Nissie and Ethel Grossman, husband and wife; Everett P. and Naomi Grossman, husband and wife; and Sidney W. and Frances A. Grossman, husband and wife. Such individuals have filed petitions in these consolidated cases, except that because of their deaths, a petition on behalf of Reuben A. Grossman was filed by his estate, Nissie Grossman, executor, and on behalf of Ethel Grossman, by her estate, Nissie Grossman, executor. Reuben A. Grossman, *72 Joseph B. Grossman, Joseph B. Grossman II, Sidney W. Grossman (Sidney), Maurice Grossman, Nissie Grossman, Bernard D. Grossman (Bernard), Morton S. Grossman, and Everett P. Grossman will sometimes be collectively referred to as the Grossman family group. The Grossman Family Trust (the trust) was organized on January 5, 1938, and during the year 1964, was a charitable organization within the meaning of section 170(c) (2) of the Internal Revenue Code of 1954. [2] The original 5 trustees of the trust were Joseph B. Grossman, Reuben A. Grossman, and Jacob Grossman. On June 8, 1948, the provisions of the trust indenture were amended, and each of the three original trustees was empowered to execute, acknowledge, and deliver any legal instrument either for or on behalf of the other trustees, and by doing so, bind the trust. On December 16, 1954, the trust indenture was amended to raise the limit on the number of trustees from three to seven, and the four additional trustees named were Nissie Grossman, Joseph B. Grossman II, Bernard D. Grossman, and Sidney W. Grossman. Finally, on November 15, 1960, the trust indenture was amended with the result that any individual *73 who was both a trustee and the son of an original trustee was empowered to bind the trust in the same manner as an original trustee and to the same extent. At all times relevant to the issue herein, all the above-mentioned trustees, other than Jacob Grossman, were trustees of the trust, and no other petitioner served as trustee. Of the additional trustees named in 1954, Sidney, the son of an original donor, was not the son of an original trustee, and therefore, was not empowered to act for the trust in the execution of legal instruments. However, Bernard was a son of an original trustee, and therefore, could individually act on behalf of and bind the trust. 6 Grossman Industrial Properties, Inc. (the corporation), was at all relevant times a corporation duly organized under the laws of the Commonwealth of Massachusetts, and as of December 31, 1964, such corporation was wholly owned by the members of the Grossman family group, members of their family, or entities under their control. On December 10, 1956, the members of the Grossman family group entered into an indemnity agreement (the indemnity *74 agreement). [3] The substantial terms of the indemnity agreement provided that inasmuch as each member was, from time to time, called upon to act for the group in business affairs, each of the parties agreed to indemnify on a proportional basis any one of the other parties who acted for the group and to accept in equal shares the responsibilities accruing from commitments which any one of the parties made. In addition, it was provided that in the event of the death of one of the parties, the indemnity agreement would continue in full force and effect as between the remaining parties. At all relevant times during the year at issue, the indemnity agreement was in full force and effect. 7 In the years prior and subsequent to the transaction at issue, the Grossman family group acquired a number of old industrial properties. Usually, Sidney, who was active in the market for such properties, looked at the property, consulted with Bernard, and made the decision as to whether such property should be purchased. Thereafter, the other members of the Grossman family *75 group generally gave their approval as a matter of course. With respect to a sale of property, more members of the Grossman family group were involved, but the decision was still primarily that of Sidney, acting in consultation with Bernard. However, when property owned by the Grossman family group was donated to the trust, the decision was made only after a full discussion with the family. In the late fall of 1963, Sidney began negotiations for an old industrial property located in Watertown, Connecticut (the property). The owner, a large national company, had advertised the property for sale. It consisted of several connected industrial buildings, which were constructed at various times between 1912 and 1948 and had a gross floor area of 255,740 square feet. It was located in the industrial zone of Watertown, was within the Watertown fire district, and was served by municipal water and sewer. It had a side track connected to a major railroad, and its highest and best use was for industrial 8 purposes. The property had been vacant for several years. It was subject to a local real estate tax imposed at the rate of $40.75 per $1,000.00 of assessed valuation. In 1963, *76 the property was assessed for approximately $800,000, but during the course of 1964, the assessment was reduced to approximately $380,000. After some bargaining between Sidney and the seller over the price to be paid for the property, the negotiations culminated with the execution of a purchase and sale agreement on April 16, 1964. Under the terms of the agreement, Sidney was the purchaser, and the property was to be conveyed to the "PURCHASER or to his nominee" for the price of $150,000. Of that amount, $15,000 was to be paid upon execution of the agreement, and $135,000 was to be paid upon delivery of the deed. The deposit was paid by Sidney on April 16, 1964, with funds borrowed from the corporation. On the same day, which was a Thursday, Sidney prepared and sent to the members of the Grossman family group a memorandum informing them of the purchase. In the memorandum, he stated that he had been acting as agent for the group, even though the agreement was in his name, and that each of the members of the Grossman family group would have a one-ninth interest in the rights and obligations under the purchase and sale agreement. 9 During the following weekend, there was *77 a family gathering at which the members of the Grossman family group discussed their plans for the property. During that weekend, the decision was made to donate their rights in the property to the trust, and on April 20, 1964, such assignment was made. In the assignment, it was stated by the assignors that in their opinion the property had a value substantially in excess of $150,000; that the purchase at this price had been possible only because of the desire of a company in the seller's position to divest itself of non-earning assets as soon as possible; that in the opinion of the assignors, the property had a value of $262,500; that the transfer was being made in consideration of the philanthropic activities of the trust; that the trust was to repay the $15,000 deposit and pay the $135,000 remaining on the purchase price; and that the balance of the value of the property ($112,500) was to be considered a donation of $12,500 by each of the assignors. Further, it was stated that the assignors would, within 60 days, arrange for an appraisal justifying the value assigned. Bernard accepted for the trust, and the trust reimbursed the corporation for the loan it made to Sidney. *78 10 On April 23, 1964, Sidney sent a letter to the seller of the property to inform it that the trust was his nominee to take title to the property, and on July 1, 1964, the trust paid the balance of the purchase price and took title to the property. The trust paid all legal fees involved in connection with the purchase of the property. Approximately 1 month after the assignment to the trust, the members of the Grossman family group came into possession of an appraisal of the property which had been made in September 1963 for the purpose of appealing the local real estate assessment. The value placed on the property by the appraiser at that time was $268,350. On September 10, 1964, the trust received an offer to purchase the property, and on October 26, 1964, the trust conveyed the property to a newly formed unrelated entity for a total price of $375,000, of which $25,000 was paid in cash and the balance in the form of two 10-year mortgage notes. In his Federal income tax return for the year 1964, each member of the Grossman family group deducted $12,500 as a donation to the trust, and on May 15, 1970, the respondent disallowed each of such claimed deductions "for lack *79 of substantiation." 11 OPINION Initially, we must decide whether to give effect to the contract made by Sidney to purchase the property on behalf of the Grossman family group and the transfer of such contract to the trust. In his brief, the respondent argued that the purchase and the ensuing donation made by the members of the Grossman family group were sham transactions, devoid of economic reality, and that in effect, Sidney purchased the property for the trust. On the other hand, the petitioners contended that when Sidney made the contract to purchase the property, the Grossman family group acquired a valuable right and subsequently made a gift of it to the trust. They argued that the deduction should not be disallowed merely because the trust could have obtained the property in a different manner giving rise to different tax results. We have considered the contentions of the parties, and because the members of the Grossman family group and the trust were closely related, we have given special scrutiny to the relevant evidence in the record. See Mark Bixby, 58 T.C. 757, 776 (1972). On the basis of such consideration, we hold that the purchase and transfer *80 by the members of the Grossman family group should not be disregarded. 12 In Commissioner v. Court Holding Co., 324 U.S. 331 (1945), the issue was whether a liquidation and subsequent sale of assets by the stockholders should be disregarded with the accompanying conclusion that the corporation was actually the seller. The corporate taxpayer had carried on negotiations for the sale of its sole asset, but had broken off such negotiations when the tax consequence of the sale was brought to its attention. The next day, the corporation declared a liquidating dividend, and the asset was sold by the stockholders in a transaction which included substantially the same terms and conditions previously agreed upon. In deciding that the corporation was, in substance, the seller of the property, the Court stated at page 334: The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of *81 the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Footnote omitted.] However, in United States v. Cumberland Public Service Co., 338 U.S. 451 (1950), the result reached in Court 13 Holding was found not to be required because it was demonstrated that the sale was negotiated by the taxpayers for themselves and not for the corporation. Here, we are presented with an analogous problem: Was Sidney acting for the members of the Grossman family group when he made the contract to purchase the property, or was he, in substance, acting for the trust? The record indicates that he was acting for the Grossman family group. Both prior and subsequent to the transactions at issue, Sidney purchased property for the Grossman family group. The usual procedure was for him to see the property, carry on negotiations, and thereafter, make the decision *82 for the other members. Although he sometimes consulted with Bernard, the record indicates the decision was ultimately that of Sidney. On the other hand, when property which was owned jointly by the Grossman family group was donated to the trust, the decision was made after a group discussion. Similarly, when any of such property was sold, members of the family were consulted, although the final decision was made by Sidney, acting in consultation with Bernard. The record reveals that the transactions in this case took place in a manner consistent with the practices of the Grossman family group.Sidney located the property, 14 conducted the negotiations, and, after consulting with Bernard, made the decision to purchase the property. He executed a contract to purchase the property for the Grossman family group on April 16, 1964. Under the law of the State of Connecticut, such contractual right was enforceable and a valuable property right. See Cooper v. Polayes, 19 Conn. Sup. 353, 113 A.2d 599 (Conn. Superior Ct. 1955). Under the indemnity agreement, Sidney had the authority to obligate the Grossman family group, but under the trust instrument, he did not have *83 the authority to bind the trust. The members of the Grossman family group were under no compulsion to assign such right to any particular person or organization. However, they did decide to transfer the property to the trust after a discussion by the members of the Grossman family group. We are not oblivious of the fact that the property may have been purchased with the intent that it would subsequently be transferred to the trust. However, tax consequences do not depend on the motive for entering a transaction, but only upon whether the transaction was in fact what it appeared to be in form. Gregory v. Helvering, 293 U.S. 465 (1935); Chisholm v. Commissioner, 79 F.2d 14, 15 (C.A. 2, 1935), revg. 29 B.T.A. 1334 (1934), cert. denied 296 U.S. 641 (1935); see also Granite Trust Company v. United States, 238 F.2d 670 (C.A. 1, 1956); H. L. 15 McBride, 23 T.C. 901 (1955). The mere fact that a taxpayer desires to obtain a charitable deduction and conducts his affairs in such manner as to obtain the deduction *84 does not cause its disallowance. William Waller, 39 T.C. 665, 676-677 (1963); Maysteel Products, Inc., 33 T.C. 1021, 1024-1025 (1960), revd. on another issue 287 F.2d 429 (C.A. 7, 1961). In Waller, the petitioners sold at cost certain securities to a charitable family trust, which they controlled as trustees, and claimed a deduction for the value of such securities in excess of their cost. The petitioners also donated stock from their personal margin account to the same trust, subject to a personal indebtedness, which was equal to their basis in the stock. In Maysteel, the taxpayer purchased bonds with a substantial amount of borrowed funds. The Court found that the petitioner entered into the transaction, in part, to obtain a deduction for the contribution of the bonds to a private charitable organization which had been organized by the stockholders of the petitioner. In both cases, the petitioners had made contributions of property owned by them, and accordingly, the charitable deductions were allowed by the court. See also Curt Teich Foundation, 48 T.C. 963, 972 (1967), affd. per curiam 407 F.2d 815 (C. *85 A. 7, 1969). 16 On April 20, 1964, the Grossman family group transferred to the trust the contractual right to purchase the property. If the trust were not closely related to the Grossman family group, there would be no problem in allowing the deduction. Because we have found that there was an actual transfer of a valuable property right to a trust which qualified as a charitable organization under section 170(c) (2), the result should be no different merely because such charitable organization was closely related to the donors. The respondent draws our attention to the short time-span between the purchase and the subsequent transfer to the trust, the absence of any out-of-pocket expenditure by the Grossman family group, and the fact that Bernard, with whom Sidney consulted, was empowered to bind the trust, and argues that such factors indicate that no actual purchase was made by the Grossman family group. However, such facts do not lead to the conclusion urged by the respondent. The fact that the members of the Grossman family group held the contract for only 4 days is one of many factors to be considered and is not controlling if other factors in the record indicate *86 the transaction had substance. In United States v. Cumberland Public Service 17 Co., 338 U.S. 451 (1950), the Court found the subsequent sale by the shareholders to be one of substance, even though the Court of Claims ( Cumberland Public Service Co. v. United States, 83 F. Supp. 843, 850 (1949)) found that it was made 2 days after the liquidation. Similarly, the mere fact that Sidney borrowed the downpayment for the property is also of little significance. There is nothing in the record before us to indicate the $15,000 debt to the corporation was not intended to be valid and enforceable. In Waller, part of the securities transferred were purchased on margin, and when transferred, were subject to an indebtedness equal to the basis in such stock. Finally, although Bernard had the power to act for and bind the trust, it was Sidney who conducted the negotiations and made the decision to purchase the property. There is nothing in the record to indicate that Sidney was acting for the trust, and the respondent, prior to his brief, never even suggested the possibility, although he had the opportunity to question Sidney concerning such possibility. Theatre Concessions, Inc., 29 T.C. 754 (1958); *87 see also Alameda Realty Corporation, 42 T.C. 273, 283 (1964); E. O. Fippin, 2 B.T.A. 350 (1925). Accordingly, we cannot conclude that Sidney was acting for the trust when he purchased the property for the Grossman family group. 18 In these circumstances, the purchase by the Grossman family group and the subsequent transfer to the trust are not to be disregarded. Accordingly, we must determine the fair market value of the property on the date the right to purchase such property was transferred to the trust. With respect to contributions of property, section 1.170-1(c) (1) of the Income Tax Regulations provides in pertinent part: (c) * * * (1) General rules. If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge *88 of relevant facts. * * * The petitioners contend that the fair market value of the property was at least $262,500. On the other hand, the respondent contends that the price agreed to by Sidney after arm's length bargaining - $150,000 - reflected the fair market value of the property at that time. Our determination of fair market value begins with the recognition that the burden rests on the petitioners to prove that the property had a fair market value in excess of that determined by the respondent. Rule 32, Tax Court Rules of Practice. However, where competent evidence 19 is introduced to rebut the presumption of correctness which rests in the respondent's determination, the issue with respect to valuation must be decided on the basis of all the relevant evidence in the record. Daniel S. McGuire, 44 T.C. 801, 806-807 (1965). Here, the record contains evidence of fair market value in excess of $150,000. Considering the record as a whole, we are convinced that the property had a fair market value when transferred to the trust of at least $262,500. Sidney conducted *89 negotiations for the purchase of the property, and such negotiations culminated in the execution of a purchase and sale agreement within 4 days of the transfer to the trust. The price agreed upon was $150,000. The price agreed upon in such a sale is very persuasive evidence of fair market value. Douglas Hotel Co., 14 T.C. 1136, 1141 (1950), affd. 190 F.2d 766 (C.A. 8, 1951), cert. denied 342 U.S. 893 (1951); E. Louis Jacobs, 20 B.T.A. 529 (1930); Herbert L. May, 19 B.T.A. 229 (1930). However, the property had been vacant for several years prior to the sale and was subject to a local real estate tax imposed at the rate of $40.75 per $1,000.00 of assessed valuation. In 1963, the property, including the land and buildings, was assessed for approximately $800,000, and during the course of 1964, the assessed value was reduced to approximately $380,000. In these circumstances, the price agreed upon by Sidney reflected 20 the desire of the seller to dispose of vacant real estate heavily burdened by local taxes, and accordingly, such price may not have accurately reflected the fair market value of the property at *90 that time. Daniel S. McGuire, supra at 808-809; sec. 1.170-1(c) (1), Income Tax Regs.
On the other hand, the trust sold the property on October 26, 1964, for $375,000. Such sale, which was conducted at arm's length, also is competent and significant evidence of value. Philip Kaplan, 43 T.C. 663 (1965); Estate of Fredericka Loewenstein, 17 T.C. 60 (1951); compare Daniel S. McGuire, supra.Moreover, there is no evidence in the record to indicate that the market conditions for industrial real estate improved in the Watertown area or that capital improvements were made to the property while held by the trust. The absence of such evidence enhances the probative value of the subsequent sale. J. E. Lummus, 21 B.T.A. 79 (1930). However, the record indicates that such sale involved exceptionally favorable financing advanced by the trust to the purchaser. Accordingly, the price agreed upon in such sale must be discounted in order to reflect a premium paid for such financing. When so adjusted, such price still provides strong support for a valuation of the property in excess of $262,500. *91 21 The record also contains the opinion as to the value of the property of Frank A. Mason, who was a qualified expert in valuing such property. In his opinion, the value of the property on April 20, 1964, was $350,000. He arrived at his valuation through means of the income approach, which involved a capitalization of the potential earnings, and checked his result through use of comparable sales. Through investigation, he determined that the average rental rate for the type of industrial property which was transferred to the trust was 50 cents per square foot. He applied that rate to the rentable area, which was less than the gross area, and accounted for vacancies, estimated operating expenses, and interest on the land value. Utilizing a capitalization rate of 15 percent, he determined that the total fair market value of the land and buildings was approximately $350,000, as of April 20, 1964. However, the figure arrived at by Mr. Mason, which amounted to $1.37 per square foot of gross floor area, exceeded the cost per square foot of gross floor area of the five comparable sales - in one instance, the discrepancy exceeded 50 cents per square foot. Accordingly, the appraisal *92 of Mr. Mason must be adjusted before it accurately reflects fair market value. Yet, even when an appropriate adjustment is made, his appraisal supports a fair market value of at least $262,500. 22 Finally, at the time of the transfer to the trust, Sidney was active in the market for unwanted industrial properties. In the document which transferred the property to the trust, he and other members of the Grossman family group stated that the fair market value of the property was substantially in excess of $150,000, and that such price reflected the desire of the seller to divest itself of non-earning assets. Such statement, which is admittedly self-serving, was contemporaneously made with the transfer to the trust, was based on personal experience, and is corroborated by other evidence in the record. [4] In these circumstances, the opinion of Sidney is some evidence of value. See, e.g., W. F. Harmon, 13 T.C. 373, 383 (1949); Porter Property Trustees, Ltd., 42 B.T.A. 681, 692 (1940), affd. sub nom. Porter v. Commissioner, 130 F.2d 276 (C.A. 9, 1942). *93 Considering all the evidence, we are convinced that Sidney acquired the property at a bargain price and that such price did not represent the fair market value of the property at that time. Even after making the appropriate 23 adjustments in the price at which the trust sold the property and in the value determined by Mr. Mason, such evidence convincingly establishes that the value of the property was in excess of $262,500 at the time of its transfer to the trust, and we so find. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Maurice Grossman and Marilyn Grossman, docket No. 5315-70; Morton S. Grossman and Sylvia K. Grossman, docket No. 5316-70; Joseph B. Grossman II and Jean A. Grossman, docket No. 5367-70; Estate of Reuben A. Grossman, Deceased, Nissie Grossman, Executor, and Mary S. Grossman, docket No. 5368-70; Bernard D. Grossman and Grace S. Grossman, docket No. 5369-70; Nissie Grossman and Estate of Ethel Grossman, Deceased, Nissie Grossman, Executor, docket No. 5370-70; Everett P. Grossman and Naomi Grossman, docket No. 5371-70; Sidney W. Grossman and Frances A. Grossman, docket No. 5372-70. ↩
2. All statutory references are to the Internal Revenue Code of 1954. ↩
3. Jacob Grossman was a party to this indemnity agreement but was deceased at the time of the transaction at issue.↩
4. Among the corroborating evidence is an appraisal made for the purpose of lowering the real estate assessment in 1963. Such appraisal was introduced and accepted into evidence, not as proof of the fair market value asserted therein, but to demonstrate that the fair market value determined by the Grossman family group was reasonable. ↩